[Cite as *State v. Holbrook*, 2015-Ohio-4780.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

State of Ohio                                            Court of Appeals No. H-14-003

    Appellee                                            Trial Court No. CRI 20130365

v.

Connor C.D. Holbrook                          **DECISION AND JUDGMENT**

    Appellant                                            Decided: November 20, 2015

* * * * *

Daivia S. Kasper, Huron County Prosecuting Attorney, for appellee.

James Joel Sitterly, for appellant.

* * * * *

**JENSEN, J.**

{¶ 1} This is an appeal from the January 28, 2014 judgment entry of the Huron

County Court of Common Pleas, following a jury trial, in which appellant, Connor

Holbrook, was found guilty of complicity to commit felonious assault, complicity to

commit tampering with evidence, and obstructing justice. The trial court convicted and

sentenced Holbrook to four years in prison for complicity to commit felonious assault, one year for complicity to commit tampering with evidence, and one year for obstruction of justice. The trial court further sentenced Holbrook to three years of post-release control. The trial court ordered the prison sentences to be served concurrently for a total of four years in prison. Holbrook now appeals. For the reasons that follow, we affirm the judgment of the trial court.

{¶ 2} In the early morning hours of Monday, April 22, 2013, Tyler Smith struck Austin Thornton on the side of his head with a crowbar.[1] Thornton suffered a life-threatening brain injury. Eye witnesses identified Smith as the perpetrator and indicated appellant and appellant's girlfriend, Brianna Boonie, had accompanied Smith to the scene.

{¶ 3} On May 17, 2013, a Huron County Grand Jury issued a six-count indictment charging appellant with conspiracy to commit murder in violation of R.C. 2923.01(A)(1) and/or (2); attempted murder in violation of R.C. 2923.02(A) and 2903.02; felonious assault in violation of R.C. 2903.11(A)(1) and (D)(1); felonious assault in violation of R.C. 2903.11(A)(2) and (D)(1); obstructing justice in violation of R.C. 2921.32(A)(1) and/or (3) and/or (5) and (C)(4); and tampering with evidence in violation of R.C. 2921.12(A)(1).

{¶ 4} The following evidence was presented at trial.

---

[1] Throughout the trial, the weapon that caused injury to Thornton was referenced as a nail puller, a crowbar, and a tire iron. For consistency's sake we will refer to it throughout this opinion as a crow bar.

2.

{¶ 5} Alexis Bodkin became romantically involved with Tyler Smith in 2011 while they were juniors in high school. They dated on and off until December, 2012. In March, 2013, Bodkin found out she was pregnant. Initially, she thought the child was fathered by Smith. When Smith found out about the pregnancy, he was excited by the news.

{¶ 6} In the weeks leading up to the events in question, Bodkin began communicating with another young man, Austin Thornton, via Twitter and text messaging. On Sunday, April 21, 2013, Bodkin informed Smith, by phone, that she was not interested in getting back into a relationship with him nor did she want him to accompany her to a prenatal appointment the following day. This upset Smith. Shortly thereafter, Smith went to see appellant and appellant's girlfriend, Brianna Boonie. When Smith arrived at Boonie's apartment, Smith was "in hysterics * * * you know, tears, crying, sobbing the whole nine yards."

{¶ 7} After several more phone calls and engaging in what was described as a "twitter war" with Bodkin and her friends, Smith tried to call Bodkin on her cell phone. Thornton answered Bodkin's cell and "words were exchanged" between the two young men.

{¶ 8} Shortly thereafter, Smith informed appellant that he wanted to go out to Bodkin's home. Because Smith did not have a valid driver's license, appellant offered to drive Smith's truck. Smith agreed. At 11:41 p.m. appellant's girlfriend posted the

3.

following question on her Twitter account: "Anyone gotta gun?" A few minutes later, appellant, appellant's girlfriend, and Smith, headed out of Bellevue towards Bodkin's Willard, Ohio, home.

{¶ 9} As appellant drove, Smith, by phone, instructed Bodkin, Thornton, and Bodkin's friend, Erin Barnett, to meet him at the end of Bodkin's driveway. When they arrived, appellant parked Smith's truck on the street near Bodkin's home. Smith jumped out of the truck. With a crowbar in hand, Smith immediately started walking toward Thornton engaging the victim in a verbal confrontation. As Thornton turned towards Bodkin's house, Smith hit Thornton on the torso with the crowbar. Thornton grabbed his side and exclaimed, "Dude don't do this, don't do this," and started walking backwards. Smith then hit Thornton on his temple with the crowbar. Thornton dropped to the ground.

{¶ 10} When appellant saw Thornton hit the ground he exclaimed, "let's go, we need to leave." Appellant, appellant's girlfriend, and Smith retreated to the truck and drove away. As they were driving, Smith pitched the crowbar out the passenger-side window of the truck's small cab. When they arrived back in Belleview, appellant parked Smith's truck in the parking lot of a nearby apartment complex.

{¶ 11} Meanwhile, Bodkin and Barnett rushed Thornton to Willard Hospital. Thornton was then air-lifted to Mercy St. Vincent Medical Center in Toledo. Bodkin and Barnett were questioned by and submitted written statements to law enforcement.

4.

{¶ 12} Within hours, deputies found appellant walking out of his girlfriend's apartment building. Initially, appellant denied having recently seen Smith. One of the deputies then escorted appellant up to his girlfriend's apartment so that appellant could retrieve his shoes. At trial, the deputy explained:

I observed [appellant] grab the door handle to his, what I assumed was his apartment, turn the knob, push on the door and the door opened about a quarter of an inch but it appeared to be locked, didn't open any further than that. He then stepped back from the door and yelled down to [his girlfriend], who was downstairs, do you have the keys, and when he did that, I observed that the door closed. The quarter inch that he had initially opened it, I observed that close. * * * At that point I believed there was, somebody was still inside the apartment. * * * I asked [appellant] if there was somebody inside the apartment. He said, no. He grabbed the door handle and turned it, now it's unlocked. So, it was unlocked. He opened the door, and I asked him to step aside, because there had to have been somebody in the apartment at that point. * * *

I asked [appellant] to step to the opposite side of the hallway. I asked for another unit to come up because I believed we had somebody inside the apartment * * * we asked [appellant] then, is Tyler Smith inside of this apartment. At that point he nodded his head, and said, yes, he is.

{¶ 13} The Sheriff and his deputies began giving commands into the apartment for Smith to come out. Smith surrendered and was transported to the Bellevue Police station. Shortly thereafter, appellant and appellant's girlfriend arrived at the station to give voluntary statements.

{¶ 14} Appellant's first interview began at 3:45 a.m. An audio recording of the interview was played for the jury. Early in the recording, appellant apologized for not immediately being honest about Smith's location.

{¶ 15} During the interview, appellant explained that Smith had arrived at his girlfriend's apartment about 4:00 p.m. the previous afternoon. According to appellant, Smith was "extremely upset" and having "severe relationship issues" with Bodkin, his "ex-girlfriend." In regard to Thornton answering Bodkin's phone the previous evening, appellant indicated that Smith reacted "violently, I mean not violently like he was going to – I didn't think he was going to hurt somebody." Appellant explained that as the evening went on, Smith and Thornton spoke on the phone several times. Appellant denied overhearing anything that Smith said to Thornton, but acknowledged that Smith was agitated. Appellant explained that after the phone conversations with Thornton,

> [Smith] was even more hysterical, he couldn't think straight * * * he had said like you know, I wish I could beat this kid up, things like that like kinda nothing that lead me to believe he was going to assault somebody * * * I think he said something about wishing he could hit the kid or something like "man I wish I could find this kid."

Originally, appellant thought Smith simply wanted to have a face-to-face conversation with Thornton. But as they drove closer to Bodkin's home appellant "could tell [Smith] wanted to hit [Thornton]."

{¶ 16} During the interview, appellant indicated that when Smith hit Thornton on his left temple, Thornton dropped "instantaneously," and "folded like a lawn chair." Appellant asserted that he saw Smith hit Thornton but that he could not tell what Smith had in his hand until he actually hit [Thornton] with the crowbar. He opined that the crowbar came from the back of Smith's pick-up truck. When asked what had happened to the weapon, appellant indicated that Smith threw it out the truck's window after driving away from Bodkin's house. Appellant then offered to show the sheriff where the crowbar could be found.

{¶ 17} At the end of the interview, appellant, at the Sheriff's request, wrote the following "letter" to Thornton's family.

> I firmly and sincerely apologize for my actions regarding the assault on your son [Thornton]. The events that took place were extremely out of hand and escaladed to a point I never thought imaginable. What has happened to your son is a tragedy, and I know that a lifetime worth of apologies could never ever begin to make up for my actions. I drove [Smith] to the scene of the crime. The decisions [Smith] and myself made will haunt me for the rest of my life, regardless of the consequences I

7.

receive. * * * What has happened to your son is a pathetic act of false vengeance. I would give anything in this world to be able to go back and stop [Smith].

I had absolutely no right in assisting [Smith], nor do I have an excuse as to why I didn't stop him. I did not honestly believe [Smith] was capable of doing such a malicious act. * * * I will regret the mistakes I made. I had no right getting involved.

I sincerely hope your son [Thornton] has a good recovery. This attack on him was a complete and unnecessary blind side. Nothing I can say or do will EVER fix your son. I hope that one day far along from now you can find it in your heart to forgive me, but I definitely don't expect you to. There is no excuse for the damage that has been cause to your family. I am deeply and sincerely sorry, from the bottom of my heart.

{¶ 18} A short time later, deputies located the discarded crowbar in the vicinity identified by appellant.

{¶ 19} During her interview at the police department, Brianna Boonie indicated that Smith had the crowbar inside the cab of the truck as they were driving out to confront Thornton. This revelation was contrary to appellant's recorded statement that Smith retrieved the tire iron from the back of his truck after they arrived at Bodkin's home. According to deputies, in an unrecorded interview at the Huron County Sheriff's

8.

office later in the morning of the attack, appellant admitted that Smith did, in fact, have the crowbar in his hands in the cab of the truck while driving out to confront Thornton.

{¶ 20} When appellant took the stand, he admitted that he drove Smith and Boonie out to Bodkin's home in Smith's truck. He asserted that he was under the assumption that Smith was going out there merely to "dissolve the relationship" with Bodkin. Appellant testified that Smith had a small metal tool in his hand as they drove out to Bodkin's home. He insisted, however, that the tool was the size of a socket wrench, not the crowbar used in the attack. Appellant further assisted that at some point on the drive out to Bodkin's home, appellant pulled the truck over and asked Smith to throw the wrench out the window.

{¶ 21} Appellant testified that when they arrived, Thornton, Bodkin, and Barnett were waiting near the end of the driveway. Appellant parked the truck on the street and by the time he got out of the truck Smith was already heading towards Thortnon. Smith started yelling at Thornton, but appellant could not hear what he was saying. When asked whether he saw Smith strike Thornton, appellant responded, "I saw [Thornton] fall." Appellant explained,

> [Smith] turned around and started coming back towards us. He wasn't walking. He wasn't sprinting. He was somewhere in the middle, kind of a jog basically. I kind of figured that [Smith] hit [Thorton], and he caught him on the jaw and he knocked him out. That was the assumption I was under.

{¶ 22} Appellant testified that when they got back to Bellevue, Smith instructed appellant to park his truck "past [Boonie's] apartment complex." Appellant wanted to go to bed, so he and Boonie walked back to Boonie's apartment. Appellant instructed Smith to go home. Appellant fell asleep on Boonie's couch and Smith came back to the apartment and left again. According to appellant, after he fell asleep, Smith "obviously * * * came back at some point."

{¶ 23} At approximately 3:00 a.m., appellant received a telephone call from his younger sister. She indicated that officers were looking for him. By the time he put on a sweatshirt and walked outside, he was met by several deputies. Appellant testified that at the time he "didn't know for sure" if Smith was in Boonie's apartment. Then, when the officer informed appellant they were investigating a potential murder and Smith was the lead suspect, appellant changed his answer. He explained,

> [The officer] said * * * do you want to change your answer. I said, yeah, he's upstairs * * * I just pointed upstairs. * * * After they said the word "murder," you know, it kind of hit home for me. I told them, yeah, he's upstairs. A couple of them proceeded to go upstairs."

Appellant asserted that up until that time, he had no knowledge or belief that Thornton was severely injured. He expressly stated that he found himself "involved in more drama than [he] wanted to be" and things "didn't go the way [Smith] told [him] they would go."

{¶ 24} On the stand, appellant denied confessing to the officers that Smith "was waiving or flailing a crowbar in the * * * cab of the truck." He further denied knowing

there was "a weapon involved until it was thrown out the window." The following exchange occurred on cross examination:

Q. You want the jurors to believe that Sheriff Howard is lying when he says you admitted that you drove with the crowbar in the car?

A. Yes, sir. Absolutely.

Q. He's lying?

A. If he was telling the truth, wouldn't he have a tape of it being that he questions Tyler Smith for three hours and 12 seconds before me and Alexis [Bodkin] and Erin Barnett for an hour and a half after me –

Q. [Deputy] Ted Patrick is lying as well?

A. Yes, sir, absolutely.

Q. And you're the one telling the truth here?

A. Yes, sir. They don't have a tape to prove me wrong, do they?

{¶ 25} Appellant denied overhearing any of the phone calls Smith made from the truck on the drive to Bodkin's home, claiming that music was being played loudly on the truck's audio system.

{¶ 26} Erin Barnett testified that she was hanging out with Bodkin and Thornton at Bodkin's home on Sunday, April 21, 2013. She indicated that several phone calls were made and received between Smith, Smith's mother, and Bodkin. Barnett explained:

Well, [Smith]'s mom was calling [Bodkin] threatening her, and she hung up the phone, and [Smith] kept calling and calling, and that's when

[Thornton] asked me if he should answer the phone. I told him, I shook my head. I just shrugged my shoulder. I said, I don't know, just stay out of it * * * and then it rang again, it was [Smith], and [Thornton] grabbed it. He answered it, and [Smith] was just threatening him, threatening to knock his teeth out. It along with [Appellant].

When asked if any of the calls were from appellant or whether she heard appellant say anything over the cell phone speaker, Barnett stated:

I heard [appellant] in the background, he was calling [Thornton] a little bitch, quote, I heard him egging it on, saying, we're on our way, and [Smith]'s like, yeah, we're on our way, I'm going to knock your teeth down your throat, you'll never mess with me again, all kinds of things, and [appellant] was like telling * * * him to shut, shut his mouth, saying that, we're on our way, I'm going to kick their ass, all kind of * * * all kind of things.

Barnett further testified that she heard appellant threaten Bodkin over the phone. Specifically, Barnett indicated that appellant stated, "I'll punch you in your cock sucker."

{¶ 27} Barnett indicated that after she and Bodkin took Thornton to the hospital, she called Smith on his cell phone. She explained, "I called him and he goes, hello, he was laughing. I go, you're in a lot of trouble, and he goes, cool, and he started laughing, and he hung up on me."

12.

{¶ 28} At trial, Alexis Bodkin testified that Boonie and Smith started the "Twitter war," after she informed Smith that she was not interested in "getting back with him." She claimed that Smith and appellant tweeted, "[l]ike how I'm going to be a horrible mom, and how I'm a slut, I have sex with everyone, and how [Smith]'s going to beat [Thornton]'s ass." She then indicated that when appellant, Boonie and Smith were in the car "he said he was going to smash his teeth down his throat." When asked if she ever spoke directly to appellant, Bodkin stated "[w]hen they were on the way, I overheard, I'm like who's this. He was like this is Connor. I'm like who, he was like, yeah, I'm going to slap your – cock sucker."

{¶ 29} Following the presentation of evidence, a jury found appellant guilty of one count of complicity to felonious assault, one count of complicity to tampering with evidence, and one count of obstructing justice.

{¶ 30} On appeal, appellant sets forth the following assignments of error:

I. THE TRIAL COURT IMPROPERLY PERMITTED FACTS NOT FOUND ON THE RECORD THAT WERE PREJUDICIAL AND DENIED THE DEFENDANT'S GUARANTEES UNDER THE FIFTH AND FOURTEEN AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION..

II. THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING THE TRIER OF FACT TO CONSIDER HEARSAY

13.

EVIDENCE DENYING THE APPELLANT HIS CONSTITUTIONAL RIGHT TO CONFRONTATION.

III.  THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL OF THE CHARGE OF COMPLICITY TO FELONIOUS ASSAULT AS THE EVIDENCE PRESENTED BY THE STATE WAS INSUFFICIENT TO SUPPORT A CRIMINAL CONVICTION RESULTING IN THE JUDGMENT BEING AGAINST THE SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE.

**First Assignment of Error**

{¶ 31} In his first argument assignment of error, appellant alleges the prosecutor violated his "right against guilty by association" and attacked his credibility during closing argument.

{¶ 32} The two fold test for prosecutorial misconduct is whether the prosecutor's conduct at trial was improper and whether it prejudicially affected the substantial rights of the defendant. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). A prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987). Thus, a reversal for prosecutorial misconduct is not warranted unless it is clear that the outcome of the trial would have been different but for the misconduct. *State v. Smith*, 14 Ohio St.3d 13, 15, 470 N.E.2d 883 (1984). In reviewing closing arguments for

14.

prosecutorial misconduct, we view the remarks in the context of the entire closing argument. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001).

{¶ 33} Appellant first challenges the following portion of the state's closing argument:

> So, one thing you know is that a crime of attempted murder was committed at 12:20 on April 22nd, 2013, out in the township in Huron County. Now Tyler Smith has taken his lumps for attempted murder, and * * * we're here on the aider and abettor's case. The victim was Austin Thornton, who had turned 19 in January.

Appellant asserts that "the prosecutor's revelation that the co-defendant, Tyler Smith, had already taken his 'lumps' was prejudicial to the level that the statement compromised a fair trial." In response, the state argues that "evidence that Tyler Smith had committed Felonious Assault or Attempted Murder was overwhelming."

{¶ 34} "It is a long standing rule that information that a codefendant has pleaded guilty to or has been convicted of an offense stemming from the same facts or circumstances forming the basis of a prosecution against another is inadmissible as proof against the other." *State v. Kartsone*, 8th Dist. Cuyahoga No. 95104, 2011-Ohio-1930, ¶ 31, citing *Kazer v. Ohio*, 5 Ohio 280, 281, 1831 WL 97 (1831). "This is because evidence that another pleaded guilty to or was convicted of an offense stemming from the same facts or circumstances is not necessarily evidence that the other committed the same offense." *Id.*

15.

{¶ 35} The test used by many courts to determine whether the introduction of a codefendant's guilty plea improperly prejudiced an appellant was first set forth in *United States v. Casto*, 889 F.2d 562 (5th Cir.1989). *See Kartsone* at ¶ 34. *See also State v. Stewart*, 3d Dist. Seneca No. 13-08-18, 2009-Ohio-3411, ¶ 100; *State v. Edmonds*, 5th Dist. Richland No. 2001 CA 0009, 2001 WL 957502 (Aug. 16, 2001); *State v. Clark*, 2d Dist. Montgomery No. 13435, 1994 WL 171223 (May 4, 1994). This test requires a reviewing court to consider "(1) whether a limiting instruction was given; (2) whether there was a proper purpose in introducing the fact of the guilty plea; (3) whether the plea was improperly emphasized; (4) whether the plea was used as substantive evidence of guilt; and (5) whether the introduction of the plea was invited by defense counsel." *Kartsone* at ¶ 34.

{¶ 36} It is not argued that the introduction of the plea in this matter was invited by defense counsel. We first consider whether a limiting instruction was given and whether the information was used as substantive evidence of guilt. Here, it is important to note that the challenged information was introduced in closing argument, not during the trial. Upon review of the transcript we find that the trial court informed the jury, generally, that the statements of counsel in closing arguments "are not to be considered as evidence." The court further instructed the jury "[t]he defendant must be found not guilty unless the State produces evidence, which convinces you beyond a reasonable doubt of every essential element of the offense charged in the indictment." In this instance, we

16.

find the limiting instruction sufficient because the information was produced in closing argument and not used as substantive evidence of guilt.

{¶ 37} We next consider whether there was a proper purpose in introducing the fact of the guilty plea and whether it was improperly emphasized. It is undisputed that Smith did, in fact, cause serious injury to Thornton. During closing argument, the state implied, on one occasion, that Smith had been found guilty of attempted murder. It has long been held that "no person shall be bound by a judgment but him who has had an opportunity to be heard in the cause concluded by the judgment." *Kazer* at 282. We find that it was improper for the prosecution to reference the specific disposition of the co-defendant's case in this matter. However, the information was not improperly emphasized and appellant was eventually acquitted of conspiracy to commit murder and conspiracy to commit attempted murder.

{¶ 38} Upon consideration of all of the factors set forth in the *Casto* test, we find that the prosecutor's statement was improper. However, we do not believe the prosecutor's actions prejudicially affected appellant's substantial rights. Thus, appellant's first argument under his first assignment of error is not well-taken.

{¶ 39} In his second argument under the first assignment of error, appellant asserts that on several occasions the prosecutor impermissibly accused appellant of being a "liar." He further assert's that the prosecutor's attack on his credibility is grounds for reversal.

17.

{¶ 40} Generally, prosecutors are entitled to considerable latitude in opening statement and closing argument. *State v. Ballew*, 76 Ohio St.3d 244, 255, 667 N.E.2d 369 (1996). In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *Lott* 51 Ohio St.3d at 165, 555 N.E.2d 293. "It is not prosecutorial misconduct to characterize a witness as a liar or a claim as a lie if the evidence reasonably supports the characterization." *State v. Baker*, 159 Ohio App.3d 462, 2005-Ohio-45, 824 N.E.2d 162, ¶ 19 (2d Dist.)

{¶ 41} We have reviewed the closing arguments with close attention to each of the comments about which appellant complains. In this case, appellant's story differed from that of his girlfriend and several other witnesses. Appellant also made statements to the police in the hours after the incident – in both a recorded and unrecorded statements – that were inconsistent with his testimony at trial. Thus, the prosecutor's characterization of him as a liar was an interpretation of the evidence, not an unsupported personal opinion.

{¶ 42} We cannot see prejudicial impact on appellant's substantial rights from the prosecutor's remarks, singly or collectively. Furthermore, as stated above, the trial court properly instructed the jury that counsel's closing arguments were not to be considered evidence in the case. Thus, appellant's second argument under his first assignment of error is not well-taken.

18.

## Second Assignment of Error

{¶ 43} In his second assignment of error, appellant asserts that the trial court abused its discretion and violated his right to confront witnesses when it permitted hearsay evidence.

{¶ 44} The admission or exclusion of relevant evidence lies within the sound discretion of the trial court. *State v. Robb*, 88 Ohio St.3d 59, 68, 723 N.E.2d 1019 (2000). Consequently, a trial court's ruling as to the admissibility of evidence will not be reversed absent an abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. More than an error of law or judgment, an abuse of discretion connotes that the trial court's attitude was unreasonable, arbitrary, or capricious. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 45} In his first argument under his second assignment of error, appellant asserts that trial court erred when it permitted Erin Barnett to read into the record a written statement she submitted to authorities shortly after the incident. Appellant specifically objects to the portion of Barnett's written statement indicating that upon Smith's arrival at Bodkin's home, Smith asserted "I'm going to kill this mother-fucker."

{¶ 46} Evid.R. 801(C) defines "hearsay" as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

19.

**{¶ 47}** Evid.R. 803 provides several examples of statements "not excluded by the hearsay rule, even though the declarant is available to testify." A "recorded recollection" is defined as

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown by the testimony of the witness to have been made or adopted when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party. Evid.R. 803(5).

Here, imbedded in a testifying witness's recorded recollection is a non-testifying accomplice's out of court statement. For the sake of argument, we will assume that it was proper for the trial court to allow Barnett to read her statement to the jury. Certainly, however, Barnett's recounting of what Smith said was hearsay and its admission erroneous. Nevertheless, we conclude, from a review of the entire record, that such error did not materially prejudice the appellant as it was made moments before Smith delivered the injurious blow to Thornton's temple and does not tend to prove appellant's mental status as he drove Smith out to or from Bodkin's home. Appellant's first argument under his second assignment of error is not well-taken.

**{¶ 48}** In his second argument under his second assignment of error, appellant asserts that the trial court erred when it allowed Bodkin to testify to the content of

20.

Boonie's Twitter messages. Appellant specifically objects to Bodkin's testimony that the messages stated "how I'm going to be a horrible mom, and how I'm a slut, I have sex with everyone, and how Tyler's going to beat Austin's ass." Because appellant did not object to this evidence during trial he forfeited his claim, except for plain error. *See State v. Sanders*, 92 Ohio St.3d. 245, 257, 750 N.E.2d 90 (2001) ("under Crim.R. 52(B) plain error must be 'obvious' as well as out-come determinative"). Upon consideration, we find that the outcome of the trial would not clearly have been otherwise if appellant had objected to this testimony. Appellant's second argument under his second assignment of error is not well-taken.

{¶ 49} In his third argument under his second assignment of error, appellant asserts that the trial court erred when it permitted the following testimony from Sheriff Dane Howard: "Captain – Chief Patrick relayed that, Ms. Boonie had indicated that Tyler Smith had a crowbar in the truck the entire time in his hand, waving it around on the way from the Bellevue apartment on the way to the crime scene." Where an out-of-court statement is offered without reference to its truth, it is not hearsay. *State v. Lewis*, 22 Ohio St.2d 125, 132, 258 N.E.2d 445 (1970). Sheriff Howard's statement was not offered for its truth but rather to explain why appellant was subjected to a second interview. Thus, the statement was not hearsay prohibited by Evid.R. 801(C), and the trial court did not abuse its discretion by permitting the testimony. Appellant's third argument under his second assignment of error is not well-taken.

21.

{¶ 50} In his fourth argument under his second assignment of error, appellant asserts that the trial court erred when it permitted Detective William Duncan to provide evidence concerning cellphone movement as it relates to cellular phone towers. Assuming, arguendo, that this evidence was inadmissible; we find that it is not prejudicial to the appellant. Appellant admitted, on the stand, that he drove Smith to and from Bodkin's home in the early morning hours of April 22, 2013. Appellant's fourth argument under his second assignment of error is not well-taken.

## Third Assignment of Error

{¶ 51} In his third assignment of error, appellant asserts that the trial court erred in overruling his Crim.R. 29 motion for judgment of acquittal. Appellant argues that the state did not present sufficient evidence to sustain a conviction for complicity to commit felonious assault. Specifically, appellant asserts there was insufficient evidence introduced to support the mens rea element of the offenses, i.e., that appellant acted "knowingly."

{¶ 52} Crim.R. 29(A) provides:

> The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

22.

**{¶ 53}** Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a jury verdict as to all elements of the crime. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The proper analysis under a sufficiency of the evidence standard is "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In order to affirm the denial of a Crim.R. 29 motion, we need only find that there was legally sufficient evidence to sustain the guilty verdict. *Thompkins* at 386.

**{¶ 54}** Appellant was convicted of complicity to commit felonious assault in violation of R.C. 2903.11(A)(1) and R.C. 2923.03(A)(2), a felony of the second degree. R.C. 2903.11(A)(1) provides that "No person shall knowingly * * * [c]ause serious physical harm to another[.]" In turn, R.C. 2923.03 defines complicity and provides that "(A) No person, acting with the kind of culpability required for the commission of an offense, shall * * * (2) Aid or abet another in committing the offense[.]"

**{¶ 55}** "Under R.C. 2923.03, a person may be an accomplice in an offense and prosecuted as the principal offender if, among other things, he aids or abets another in committing the offense while acting with the kind of culpability required for commission of the offense." *State v. Coleman*, 37 Ohio St.3d 286, 525 N.E.2d 792 (1988), paragraph two of the syllabus. "To aid is to assist. To abet is to incite or encourage." *State v. Sims*,

23.

10 Ohio App.3d 56, 58, 460 N.E.2d 672 (8th Dist.1983). A person's mere association with a principal offender is not an aiding or abetting of the principal's act; there must be some active participation, assistance, or encouragement by the accomplice. *State v. Nievas*, 121 Ohio App.3d 451, 456, 700 N.E.2d 339 (8th Dist.1997). "'Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

{¶ 56} A person acts knowingly when he is aware that his conduct will probably cause a certain result. R.C. 2901.22(B). "It is not necessary that the accused be in a position to foresee the precise consequences of his conduct; only that the consequences be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct." *State v. Mobley-Melbar*, 8th Dist. Cuyahoga No. 92314, 2010-Ohio-3177, ¶ 19, quoting *State v. Losey*, 23 Ohio App.3d 93, 96, 491 N.E.2d 379 (10th Dist.1985).

{¶ 57} The evidence summarized above indicates that appellant drove Smith both to and from Bodkin's home. Several witnesses referenced a "twitter war" that persisted for several hours prior to the attack. Appellant indicated to authorities in a recorded statement that on the way out to Bodkin's home appellant "could tell [Smith] wanted to hit [Thornton]."

{¶ 58} Barnett testified that she heard appellant threaten to punch or kick Bodkin over the phone while appellant was driving towards Bodkin's home. Appellant denied

24.

Smith had a crowbar in the car but suggested he was swinging a socket wrench around in the cab of the truck on the drive out to Bodkin's home. After Smith struck Thornton, appellant encouraged Smith to quickly get back into the truck.

{¶ 59} Construing the evidence most strongly in favor of the state, we find that the evidence, if believed, could have convinced a reasonable trier of fact that appellant aided Smith in the commission of the crime and appellant's criminal intent may be inferred from his presence, companionship, and conduct both before and after the attack. Consequently, the evidence was sufficient to support this conviction. The trial court did not err in denying appellant's Crim.R. 29 motion for acquittal. Appellant's third assignment of error is not well-taken.

### Conclusion

{¶ 60} For the reasons set forth above, the judgment of the trial court is affirmed. The costs of this appeal are assessed to appellant under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.         _____
                   JUDGE
Thomas J. Osowik, J.

James D. Jensen, J.        _____
CONCUR.               JUDGE

               _____
                   JUDGE

25.

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.