[Cite as *State v. Andrews*, 2023-Ohio-4237.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

State of Ohio                                              Court of Appeals No.  OT-22-056

    Appellee                                        Trial Court No.  21 CR 243

v.

Amanda A. Andrews                              **DECISION AND JUDGMENT**

    Appellant                                      Decided:  November 22, 2023

* * * * *

Dave Yost, Ohio Attorney General, and Drew Wood, for appellee

Brian A. Smith, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, the defendant-appellant, Amanda Andrews, was convicted of violating a protection order, menacing by stalking, and two counts of failure to pay child support.  The Ottawa County Court of Common Pleas imposed an aggregate seven-month prison sentence for these convictions, suspended the prison sentence, and granted Andrews community control.  For the following reasons, we affirm.

## I. Background

{¶ 2} Andrews was charged by way of an indictment on November 4, 2021. Originally, Andrews was charged with seven offenses, but three counts were dismissed before trial, leaving the following to be tried: violation of a protective order, in violation of R.C. 2919.27(A)(1) and (B)(4), a felony of the third degree (Count 2); menacing by stalking, in violation of R.C. 2903.211(A)(1) and (B)(2)(e), a felony of the fourth degree (Count 3); and two counts of nonsupport of dependents, in violation of R.C. 2919.21(A)(2) and (G)(1), felonies of the fifth degree (Counts 6 and 7).

{¶ 3} The Ottawa County Court of Common Pleas commenced a jury trial on August 30, 2022. During the trial, evidence was introduced regarding other civil and criminal cases filed against Andrews, including a judgment entry of divorce granted in Ottawa County; a domestic violence civil protection order (DVCPO) obtained by Andrews's former girlfriend, M.K., in the Lucas County Court of Common Pleas, Domestic Relations Division; two misdemeanor cases charging Andrews with telephone harassment in the Ottawa County Municipal Court; and a felony case in Lucas County, charging Andrews with similar offenses as those alleged in this case. The judgment entries and other proceedings from those cases were authenticated and made part of the record herein.

{¶ 4} This case involves allegations that Andrews violated the DVCPO (that was granted in Lucas County), committed the offense of menacing by stalking, and failed to pay child support. All the offenses are alleged to have occurred in Ottawa County.

2.

{¶ 5} Andrews and her former wife, "B.A.," have two children together, both minors. Under the terms of the November 26, 2019 divorce decree, Andrews was ordered to pay monthly child support in the amount of $2,177.72. During the trial, a case manager with Ottawa County Job and Family Services testified that over a 104-week period, specifically between November 2, 2019 and November 2, 2021, Andrews failed to pay child support for a total of 66 weeks.

{¶ 6} Andrews was romantically involved with a different woman, "M.K.," from April of 2019 through October of 2020. Beginning in early 2021, Andrews began threatening and harassing M.K. with unwanted text messages and phone calls. M.K., who lives in Toledo, sought a protection order in Lucas County. Following an ex parte hearing on June 4, 2021, the trial court issued a DVCPO, ex parte, pursuant to R.C. 3113.31. The order protected M.K. and M.K.'s two young children. Among other conditions, the order mandated that Andrews "stay away from" and "not initiate or have any contact" with the protected persons. Andrews was served with the ex parte order that same day, June 4, 2021.

{¶ 7} Andrews continued to harass, intimidate, and threaten M.K. over the summer. On June 26, 2021, Andrews contacted M.K. and called her a "whore," among other vulgar terms, and threated to burn down the camper and gazebo where M.K. and her children were camping. Andrews told M.K. that, "your trashy, trashy gazebo will go up in flames nice when I burn your camper down, white trash bitch."

{¶ 8} On July 15, 2021, Andrews called M.K., leaving "voicemails" and sent text messages, asking if M.K. had "a bad day" and calling her a "cunt" and a "hole." M.K.

3.

testified that she had, indeed, had a bad day "because of harassing messages that [Andrews] had sent to [M.K.'s] kids' dad and his girlfriend."

{¶ 9} The June and July incidents resulted in two separate cases in the Ottawa County Municipal Court. On April 1, 2022, Andrews pled guilty and was convicted, in both cases, of telecommunication harassment, in violation of R.C. 2917.21(A)(1), a misdemeanor of the first degree. The municipal court ordered Andrews to serve 49 days in jail, to have no direct or indirect contact with M.K., and to undergo a mental health evaluation.

{¶ 10} M.K. testified that Andrews continued her harassment on August 17, 2021. On that date, M.K. went to the casino near her home in Toledo. M.K. went alone and was not expecting to see anyone she knew, especially Andrews who lived an hour away. When Andrews appeared at the casino, asking to talk, M.K. agreed. But, when the "harassing" and "nasty talk" began, M.K. left the casino without Andrews. Later, M.K. was awakened at 4:40 a.m. by Toledo police. The police told M.K. that they had Andrews in custody and that she had been on M.K.'s property. M.K. learned that Andrews had called 911 and falsely reported that M.K. was suicidal, which prompted the police to visit M.K.'s property, where they encountered Andrews and ultimately arrested her. When M.K. reviewed footage from her exterior security cameras, she could see "[Andrews] walking around [her] house, walking on [her] picnic table, waving to the camera and then taking it down, and [asking], where you at, cunt." The next day, M.K. located the missing cameras, in the front seat of Andrews's car, which was parked near M.K.'s home. M.K. summed up the incident as "just another act of her terrorizing me

4.

and trying to scare me." As a result of the incident, Andrews was charged in Lucas County with menacing by stalking, violating the protection order, and theft. The trial court record does not indicate how the Lucas County case resolved.

{¶ 11} On August 30, 2021, the Lucas County court held a full hearing on the petition for a DVCPO. M.K. and her attorney attended the hearing and offered multiple exhibits into evidence. Andrews did not attend and was not represented. Following the hearing, the trial court issued an Order of Protection, which found that Andrews had engaged in an "ongoing campaign to malign and harass" M.K. by sending "hundreds of * * * threatening, harassing and menacing" texts, calls, and emails. For example, Andrews texted M.K. that she was going to kill M.K. "in front of her children," "slit [M.K.'s] children's throats," and burn down M.K.'s house. The court also found that Andrews made 17 "completely false" and "malicious" 911 calls, telling authorities that M.K. was "suicidal and had hung herself," that M.K. was "being raped," or that M.K. was "raping someone else." On one occasion, Andrews went to M.K.'s home and attempted to "set [M.K.] on fire with a lighter" when M.K. opened the door. The trial court also found that, after the June 4, 2021 ex parte order was issued, Andrews had "damaged the security cameras installed at [M.K.'s] home." The court concluded that, by her actions, Andrews had attempted to cause M.K. bodily harm, placed M.K. in fear of imminent serious physical harm, and engaged in a pattern of conduct that knowingly caused M.K. mental distress. The court granted a full protection order, to be effective until June 4, 2026, five years from the ex parte order. The court specifically ordered Andrews not to abuse, harm, attempt to harm, threaten, follow, stalk, harass, force sexual relations upon, or

5.

commit sexually oriented offenses against M.K. or her children. Andrews was served with the protection order on September 13, 2021. She did not appeal.

{¶ 12} In the early morning hours of September 22, 2021, M.K. began receiving text messages and phone calls from unknown numbers that lasted for hours. Some of the texts accused M.K. of "accessing my accounts" while others, from a different number, were vile and racist. Based on some of the personal content and "rambling" nature of the messages, M.K. knew that the sender was Andrews. At 6:00 a.m., M.K. answered her phone and heard Andrews's voice on the other end, asking why she, M.K., was calling Andrews. M.K. testified, "but I wasn't calling her. I was sleeping. It was 6:00 in the morning." At 6:26 a.m., M.K. received some "group" text messages that included a third party named "Maggie" whom M.K. identified as Andrews's friend. The sender of the text messages "accus[ed]" M.K. of hacking into that person's iCloud account and deleting material and asked "Maggie" to "keep a copy of this text." M.K. testified that she lacked "the technical ability" or interest in "hacking" into other people's internet accounts. M.K. provided "screen shots" of the messages and phone calls to the police.

{¶ 13} A few weeks later, on October 14, 2021, M.K. was in a Southfield, Michigan hotel room for a business trip, when she received several "no caller ID calls" and FaceTime video calls from Andrews. M.K. answered some of the calls and "asked [Andrews] to stop calling [because] there's a protection order." Andrews told M.K. that she did not initiate the calls, and she told M.K. to "stop calling me" and asked M.K. "why are you calling me?" Because of this, M.K.—who had two phones with her—used her personal phone to answer the incoming video calls, and used her work phone to video the

6.

incoming calls. The videos were introduced at trial and clearly show two incoming video calls to M.K.'s personal phone, around 12:45 a.m., from Andrews' "iCloud" account. When M.K. answered the video call, she recognized Andrews speaking from her home in Catawba in Ottawa County.

{¶ 14} In the video recordings, which were played for the jury, Andrews denies initiating the calls, denies the existence of any protection order, accuses M.K. of texting her children's soccer coach, and asks what the coach's wife "is going to think about [M.K.] texting him at three o'clock in the morning." M.K. testified that she was "concerned that [Andrews] was going to call and disrupt the family [alleging] some kind of misconduct which actually did not happen. A family who I see regularly for, you know, four-year-old-soccer. And that's not the first time she had done that to a family." In all, the state produced evidence that Andrews initiated 19 calls to M.K. that night.

{¶ 15} Under cross-examination, M.K. admitted that she voluntarily saw Andrews "probably" three times while the CPO was in effect, including two trips to Cleveland in the summer of 2022, where she and Andrews "had sex."

{¶ 16} When the state rested its case, Andrews moved for an acquittal, which the court denied. However, the trial court did order Count 2 to be reclassified from a felony to a first-degree misdemeanor because the state failed to present any evidence that Andrews violated the protection order "while committing a felony offense."

{¶ 17} Andrews testified in her own defense. Andrews claimed that she went to the casino in August 2021 because she believed that the ex parte order, which barred her from having any contact with M.K., was no longer in effect. In support of her belief,

7.

Andrews testified that she and M.K. each "called Lucas County Dispatch" and that "an officer called [M.K.] back and left a message on her voicemail which she forwarded to me." Andrews also testified that she was unable to pay child support because she had been in jail and because her law license had been suspended, which prevented her from earning the money required to pay the support obligation.

{¶ 18} Andrews was found guilty and convicted as to all four counts. Although the trial court's judgment entry correctly indicates that Andrews was "found guilty by jury trial of Count #2, Violation of Protection Order, a misdemeanor of the first degree (M1)," it incorrectly refers to the felony provision of the statute, i.e. R.C. 2919.27(A)(1)(B)(4), as she was originally charged. The judgment entry should refer to R.C. 2919.27(A)(1) and (B)(2) because the trial court previously ordered the offense to be reclassified as a first-degree misdemeanor, given its finding of insufficient evidence that Andrews violated the protection order "while committing a felony offense." For this reason, our decision on this appeal will include a remand to the trial court to issue a corrected entry.

{¶ 19} For its sentence, the trial court ordered Andrews to serve six months in jail as to Count 2 (i.e. violation of a protection order); seven months in prison as to Count 3 (menacing by stalking); and six months in prison as to Count 6 and as to Count 7 (failure to pay child support), all terms to be served concurrently. The court suspended the terms of incarceration and placed Andrews on community control for a period of two years, subject to her complying with the community control conditions, attending three

8.

Alcoholics Anonymous meetings per week, having no contact with the victim, obtaining employment, and paying restitution and the costs of the proceedings.

{¶ 20} Andrews appealed and assigns four errors for our review:

ASSIGNMENT OF ERROR I: Appellant's convictions were against the manifest weight of the evidence.

ASSIGNMENT OF ERROR II: The trial court erred in failing to order severance of Counts Two and Three of the Indictment from Counts Six and Seven of the Indictment, in violation of Rules 8 and 14 of the Ohio Rules of Criminal Procedure and Appellant's right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

ASSIGNMENT OF ERROR III: The failure of Appellant's trial counsel to renew Appellant's Motion for Relief from Improper Joinder either at the close of the State's evidence, or at the close of the evidence, constituted ineffective assistance of counsel, in violation of Appellant's right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

ASSIGNMENT OF ERROR IV: The cumulative errors of Appellant's trial counsel constituted ineffective assistance of counsel, in violation of Appellant's right to counsel under the Sixth and Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

## II. Analysis

### A. The convictions are not against the manifest weight of the evidence.

{¶ 21} In her first assignment of error, Andrews claims that her convictions are against the manifest weight of the evidence.

{¶ 22} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Unlike a sufficiency analysis, we do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

### 1. Violating a Protection Order

{¶ 23} We begin with Andrews's conviction for violating the protection order. R.C. 2919.27(A)(1) provides that "[n]o person shall recklessly violate the terms of * * * [a] protection order issued * * * pursuant to section * * * 3113.31 of the Revised Code." On appeal, Andrews claims that the jury lost its way in finding that she "recklessly" violated the protection order on October 14, 2021 because "she did not know the

10.

protection order was in place."  In support, Andrews cites her own trial testimony, wherein she claimed that "a deputy from Lucas County had left a message on M.K.'s voicemail" indicating that "there's no protection order."  Andrews further claimed that M.K. "forwarded" the voicemail to Andrews's phone.

{¶ 24} As an initial matter, we note that the alleged voicemail was not marked or admitted as an exhibit, does not appear to have been played for the jury, and is not part of the appellate record.  Regardless, Andrews allegedly received this voicemail on August 17, 2021—which was almost a month before she was served with the full protection order on September 13, 2021.  Given that Andrews received service of the DVCPO on September 13, 2021, the jury did not lose its way when it concluded that she recklessly violated this order by repeatedly contacting M.K. on October 14, 2021.

{¶ 25} Andrews also argues that it was "reasonable" for her to believe that the full DVCPO had been dismissed—"even after being served with [it]" on September 13, 2021—because M.K. "had extensive contact with Andrews until at least October 14, 2021." We disagree.  As Andrews acknowledged at trial, the DVCPO clearly advised, "IF YOU VIOLATE ANY TERM OF THIS ORDER EVEN WITH THE PROTECTED PERSON'S PERMISSION, YOU MAY BE HELD IN CONTEMPT OR ARRESTED. ONLY THE COURT CAN CHANGE THIS ORDER.  YOU ACT AT YOUR OWN RISK IF YOU DISREGARD THIS WARNING."

{¶ 26} For these reasons, we find that the jury did not lose its way in concluding that Andrews behaved recklessly when she violated the DVCPO on October 14, 2021.

11.

## 2. Menacing by Stalking

{¶ 27} Andrews also complains that her conviction for menacing by stalking was against the manifest weight of the evidence. Under R.C. 2903.211, the state was required to show that Andrews, by engaging in a pattern of conduct, knowingly caused M.K. to believe that Andrews would cause her "physical harm" or "mental distress." On appeal, Andrews argues that the jury lost its way by believing M.K.'s testimony that she was "terrified" of Andrews because M.K. "repeated[ly] initiat[ed]" contact with Andrews during the term of the DVCPO, including for the purpose of engaging in sexual relations. Andrews also claims that M.K. should have "simply ignored" any unwanted phone calls or texts.

{¶ 28} M.K. testified that she willingly met with Andrews on "probably" three occasions, two of which occurred in Cleveland during the summer of 2022. According to the indictment, however, Andrews committed the menacing offense between September 13 and October 14, *2021*. Thus, we agree with the state that the two 2022 encounters are wholly irrelevant because they occurred after Andrews had committed the menacing offense.

{¶ 29} Regardless, even though M.K. "probably" had one or more consensual encounters with Andrews during the indictment period, the jury heard M.K. express her "embarrass[ment]" and regret for "ever [having] gone anywhere near" Andrews "because it backfire[d] on [her] every time." Although we consider the credibility of witnesses under a manifest-weight-of-the-evidence standard, "we extend special deference to the finder of facts credibility determinations given that it is the finder of fact that has the

12.

benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Howard*, 6th Dist. Fulton No. F-17-003, 2017-Ohio-8119, ¶ 29, citing *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.  In light of the graphic evidence of Andrews's prolonged attempts to frighten and harass M.K., we cannot find that the jury's decision to believe that M.K. was "scared" of Andrews was against the manifest weight of the evidence.

{¶ 30} Finally, Andrews urges the court to reject M.K.'s testimony as untrustworthy because M.K. supposedly admitted to making a "false police report." Under cross-examination, M.K. was asked if she recalled "a time" when she called the Oak Harbor Police Department and reported that Andrews was driving under the influence of alcohol.   M.K. admitted that, when she called the police, she was not "following" Andrews, as she told the dispatcher.  Instead, she was monitoring Andrews's location on her phone, while standing in her kitchen with Toledo Police officers present. M.K., however, stood by the substance of the report—i.e. that Andrews was "drunk and driving" and that she only avoided getting arrested because a friend came and got her.

{¶ 31} Here, the jury had the advantage of observing M.K. and Andrews testify, and it was free to accept or reject their testimony, in whole or in part.  "Just because the jury resolved issues of fact in the state's favor does not mean that the jury lost its way." *State v. Ahreshien*, 6th Dist. Lucas No. L-19-1184, 2021-Ohio-1223, ¶ 42.

{¶ 32} We find that Andrews's conviction for menacing by stalking was not against the manifest weight of the evidence.

13.

### 3. Failure to pay child support

{¶ 33} Finally, Andrews claims that her two convictions for failure to pay child support are against the manifest weight of the evidence. Under R.C. 2919.21(G)(1), a violation of the statute is a fifth-degree felony if **"**the offender has failed to provide support * * * for a total accumulated period of [26] weeks out of [104] consecutive weeks, whether or not the [26] weeks were consecutive." The state alleges that, between November 2, 2019 and November 2, 2021, Andrews failed to pay support for a total of 66 weeks, i.e. 27 weeks in 2020 and 39 weeks in 2021. On appeal, Andrews does not contest the state's case but argues that the jury lost its way in rejecting her affirmative defense to the charges, namely that while she was "unable to provide adequate" support, she did provide the support "that was within [her] ability and means." R.C. 2919.21(D).

{¶ 34} On appeal, Andrews insists that she "demonstrated [her] inability to pay" with evidence that she was incarcerated, which had a "horrific" impact on her legal practice. But, Andrew's longest stretch of time in jail—a period of 118 days—began on November 12, 2021, which was after the period of time identified in the indictment. Likewise, Andrews's law license was suspended on November 8, 2021—i.e., after the relevant period of non-support. And, although Andrews argues that she made a "substantial payment" to B.A. following the sale of the marital home, this payment occurred in January of 2023—i.e., after her trial and convictions in this case.

{¶ 35} Finally, we note that an obligor's "ability to pay" does not depend solely on whether the payor is generating an income. *See, e.g., State v. Roders*, 9th Dist. Summit No. 20962, 2002-Ohio-3867, ¶ 27 (Jury's rejection of affirmative defense was not against

14.

the manifest weight of the evidence where the physician-father, who was suspended from practicing medicine and deemed "not capable of working," maintained "stacks of" of hundred-dollar bills). Here, as the state points out, Andrews presented no evidence of "her cash reserves," or lack thereof.

{¶ 36} For the reasons set forth above, we find that Andrews's convictions were not against the manifest weight of the evidence. Therefore, Andrews's first assignment of error is found not well-taken.

## B. The trial court did not err in denying Andrew's Crim.R. 14(A) motion to sever.

{¶ 37} In her second assignment of error, Andrews claims that the trial court erred when it denied her pretrial motion to sever Counts 2 and 3 (the protective order and menacing counts) from Counts 6 and 7 (failure to support counts).

{¶ 38} Under Crim.R. 8, multiple offenses may be joined in a single indictment if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A). It is well-settled that joinder is favored and is to be "liberally permitted." (Citation omitted.) *State v. Stuckman*, 6th Dist. Sandusky Nos. S-17-039 and S-17-040, 2018-Ohio-4050, ¶ 36, quoting *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992). As we noted in *Stuckman,*

> The law favors joinder for public policy reasons, such as: to
>
> conserve judicial economy and prosecutorial time; to conserve public funds

by avoiding duplication inherent in multiple trials; to diminish the inconvenience to public authorities and witnesses; to promptly bring to trial those accused of a crime; and to minimize the possibility of incongruous results that can occur in successive trials before different juries.

*Id.* at ¶ 36, quoting *State v. Dunkins*, 10 Ohio App.3d 72, 460 N.E.2d 688 (9th Dist.1983), paragraph one of syllabus.

{¶ 39} Although joinder is favored by Ohio law, a defendant may move to sever the charges under Crim.R. 14 upon a showing of prejudice. *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990). Crim.R. 14 provides that "[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses * * * in an indictment * * * the court shall order an election or separate trial of counts." It is the defendant's burden to demonstrate that joinder is prejudicial:

A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges under Crim.R. 14 has the burden of affirmatively showing that [her] rights were prejudiced; [she] must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and [she] must demonstrate that the court abused its discretion in refusing to separate the charges for trial.

*State v. Gordon,* 152 Ohio St.3d 528, 2018-Ohio-2595, 98 N.E.3d 251, ¶ 21, quoting *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus.

16.

{¶ 40} The state can use two methods to defeat a defendant's claim of prejudice under Crim.R. 14: the "other acts" test *or* the more lenient "joinder" test. *Stuckman* at ¶ 39, citing *Lott* at 163. Under the other acts test, the state must show that evidence of the other charged offenses would be admissible as "other acts" under Evid.R. 404(B) even if the counts are severed for trial. *Stuckman* citing *State v. Gibson*, 6th Dist. Lucas Nos. L-13-1222 and L-13-1223, 2015-Ohio-1679, ¶ 28. Under the joinder test, the state can defeat a claim of prejudice by showing that the jury is capable of separating the proof of each crime because the evidence of each crime is simple and direct. *Id.* Evidence is "simple and direct" if the jury is capable of segregating the proof required for each offense. *State v. Gravely*, 188 Ohio App.3d 825, 2010-Ohio-3379, 937 N.E.2d 136, ¶ 40 (10th Dist.). "Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof." *State v. Lewis*, 6th Dist. Lucas No. L-09-1224, 2010-Ohio-4202, ¶ 33.

{¶ 41} "If a motion to sever is made at the outset of a trial, it must be renewed at the close of the state's case or at the conclusion of all of the evidence so that a Crim.R. 14 analysis may be conducted in light of all the evidence presented at trial." *Id.* at ¶ 37, quoting *State v. Rojas*, 6th Dist. Lucas No. L-11-1276, 2013-Ohio-1835, ¶ 34. If a motion to sever is not renewed, then the issue waives all but plain error. *State v. Scott,* 6th Dist. Sandusky No. S-02-026, 2003-Ohio-2797; accord *Gordon* at ¶ 22 ("Since Gordon neither sought severance pursuant to Crim.R. 14 nor objected to the joinder, we do not review the trial court's decision for an abuse of discretion; instead, as the appellate

17.

court correctly determined, on appeal we apply a plain-error standard of review to the trial court's decision regarding joinder."). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. To successfully assert that a trial court committed plain error, a defendant must show an error that constitutes an obvious defect in the trial proceedings and demonstrate that the error affected the outcome of the trial. (Citation omitted.) *Gordon* at ¶ 23.

{¶ 42} Here, Andrews moved the trial court to sever the failure to support counts at the outset of trial but failed to renew the motion, either at the close of the state's case or once all the evidence had been presented. Accordingly, we review for plain error.

{¶ 43} Andrews argues that she was prejudiced by the joinder of Counts 2 and 3 with Counts 6 and 7. She claims that, by combining different kinds of offenses—i.e. claims involving allegations of harassing conduct with claims involving allegations of financial misconduct—she was unfairly portrayed to the jury as "a habitual offender." She also complains that the state tried multiple counts together to "make Andrews less sympathetic." In other words, Andrews argues that she was prejudiced by the mere fact that the state tried multiple counts together in the same trial. This is not a viable argument. Merely trying a defendant for multiple offenses, without more, does not violate the joinder rule or create prejudice. *See* Crim.R. 8 (providing that two "or more" offenses may be charged in the same indictment under a variety of circumstances); *see*

18.

*also Struckman* at ¶ 40 (rejecting defendant's argument that the state, in joining multiple offenses, was "attempting to paint the defendant as a bad person").

{¶ 44} Andrews also claims that she was prejudiced by joinder because, according to her, "it is very likely that the nonsupport charges would not have gone to trial," but for the fact that they were joined with the other counts. Andrews bases her theory on the fact that B.A., the obligee in the child support counts, was paid a lump sum, following the sale of the marital home. However, the proceeds from the sale were not applied to Andrews's child support arrearage until January of 2023, five months *after* the case was tried, and, even then, an arrearage of $55,000 remained.[1] Therefore, we find no support for Andrews's argument that the nonsupport counts would likely not have gone to trial if they had been severed from the other counts.

{¶ 45} Finally, Andrews claims that the state failed to defeat her case of prejudice because "there is no set of circumstances" under which evidence of her alleged failure to pay child support would be admissible to prove the other counts, i.e. that she violated the protective order or committed the offense of menacing by stalking. That is, Andrews

---

[1] Twice in her brief, Andrews claims that "B.A. received a payment of $29,057.30 at the end of *2021* toward the child support arrearage, due to the sale of Andrews's home." Appellant's Brief at 18 citing Tr. at 496 (emphasis added); see also Appellant's brief at 14. This assertion is patently belied by the record. Although a witness from the Ohio Child Support Enforcement Agency referenced a "$29,057.30 payment," the "only [child support] payment in 2021 [by Andrews] was made in February, in the amount of $3,000.00, [of] which $2,957.30 was dispersed," as demonstrated by State's Exhibit 5, which was admitted without objection. State's Brief at 19. More importantly, the parties filed a joint stipulation stating that "the home of Amanda Andrews," jointly owned by her and ex-wife, B.A., sold on July 20, *2022*, and that Andrews's share of the profits, $46,535.50, were paid to B.A. "in January of *2023*,"—i.e. not the summer of 2021, and long after Andrews's trial and convictions.

19.

claims that, under the "other acts test," such evidence would have been barred under Evid.R. 404(B), which generally bars evidence of other crimes, wrongs or acts to prove a person's character.

{¶ 46} But, even if we assume that Evid. R. 404(B) would have barred evidence regarding her failure to pay child support in a separate trial regarding the other offenses, the state "need not meet the requirements of the stricter 'other acts test'" if the evidence of each offense is presented in a manner that is simple and direct. *State v. Powell*, 8th Dist. Cuyahoga No. 107276, 2019-Ohio-4345, ¶ 74, citing *State v. Franklin*, 62 Ohio St.3d 118, 122, 580 N.E.2d 1 (1991). In other words, "when simple and direct evidence exists, an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as 'other acts' under Evid.R. 404(B)." *Lott* at 163, 555 N.E.2d 293. *See also, Gravely* at ¶ 38 ("These two tests are disjunctive, so that the satisfaction of one negates a defendant's claim of prejudice without having to consider the other test.").

{¶ 47} Here, the evidence proffered by the state in support of each offense was simple and direct. Although Andrews concedes that Counts 2 and 3 have "no factual connection" to Counts 6 and 7 because "the evidence concerns two different alleged victims" and involved different "type[s] of conduct,"—i.e. M.K. as the victim in the protection order and menacing counts, and B.A. as the victim in the nonsupport counts— she argues that the evidence nonetheless overlapped because the jury heard testimony that the respective victims, M.K. and B.A., communicated with one another.

{¶ 48} But it was *Andrews*—not the state—that introduced evidence regarding communications between M.K. and B.A. That is, under cross-examination, M.K. denied

communicating with B.A., except for a "[a] couple of times." M.K. was also asked whether she had ever been in "a relationship" with B.A., which she firmly denied. And, when pressed on the subject, M.K. testified that the only time she had ever been in the "same place as B.A.," without Andrews also being present, occurred briefly in a restaurant. The relevancy of this testimony is minimal, at best, and therefore insufficient to demonstrate that the overall presentation of the state's evidence was not "simple and direct."

{¶ 49} Finally, the trial court cautioned the jury, immediately prior to deliberations, to consider each count, and the evidence applicable to each count, separately and to state its findings as to each count uninfluenced by its verdict on any other counts. Absent evidence to the contrary, we presume that the jury followed the instructions of the trial court. *Gibson*, 6th Dist. Lucas Nos. L-13-1222 and L-3-1223, 2015-Ohio-1679, at ¶ 30 (Finding no abuse of discretion where the trial court denied defendant's motion to sever where the evidence of the crimes alleged in two indictments was simple, direct and capable of being separated and where the court gave a similar instruction to the jury).

{¶ 50} In sum, we find that there was no error, let alone plain error, in the trial court's decision to deny Andrews's request to sever under Crim.R. 14. We find Andrews's second assignment of error not well-taken.

**C. Andrews failed to establish a case of ineffective assistance of trial counsel.**

{¶ 51} In her third assignment of error, Andrews alleges that her trial counsel was ineffective for failing to renew the motion to sever during trial.

21.

{¶ 52} To prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Judicial scrutiny of counsel's performance must be highly deferential." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689. To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).

{¶ 53} In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675, 693 N.E.2d 267 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255, 574 N.E.2d 483 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties

to his client. *Bradley* at 141-142. Prejudice can be shown by proving "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

{¶ 54} Andrews claims that counsel rendered deficient performance by failing to renew the motion to sever and that she was prejudiced by this failure because the motion "would have been granted, and the cases [would have been] reset on a different date." She claims, "[a]t the very least," that the issue would have been preserved for appeal and not relegated to plain error review.

{¶ 55} As discussed above, we found "*no error*, let alone plain error, in the trial court's decision to deny Andrews's request to sever under Crim.R. 14." (Emphasis added). In other words, our resolution of the second assignment of error would have been the same if the error had been preserved for appellate review by trial counsel. For this reason, Andrews cannot show that, had counsel renewed the Crim.R. 14 motion, that there is a reasonable probability that it would been granted. *See, e.g., State v. Thompson,* 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 255 ("Each of these claims recasts a merits argument as ineffective assistance of counsel * * * For the reasons explained in this opinion, we reject the merits of these underlying claims. As a result, we conclude that counsel did not provide ineffective assistance by failing to object to these alleged errors.")

{¶ 56} We find Andrews's third assignment of error not well-taken.

23.

## D. Andrews fails to demonstrate cumulative error

{¶ 57} In her fourth assignment of error, Andrews identifies "other crucial errors" by trial counsel which she claims amounts to cumulative error.

{¶ 58} First, Andrews argues that trial counsel failed to elicit testimony that she says would have "undercut" a necessary element of the menacing offense—i.e. whether M.K. actually believed Andrews would cause her physical harm or mental distress. Andrews claims that her attorney erred by "waiting until redirect" to ask a defense witness "about seeing Andrews and [M.K.] together after the civil protection was in place" because the trial court sustained the state's objection to this question as beyond the scope of cross examination. On appeal, Andrews speculates that the testimony would have "corroborated" her claim that M.K. voluntarily chose to spend time with Andrews, even after the civil protection order was in effect.

{¶ 59} We reject the argument for two reasons. First, because the witness was ordered not to answer the question, there is no evidence in the record to support Andrews's contention as to how he would have testified. Second, assuming the witness would have testified as Andrews claims, the testimony would have been, at most, duplicative of Andrews's testimony. Thus, we cannot say that the additional testimony would have had any effect on the jury's decision to find Andrews guilty of menacing. *Accord Ahreshien*, 6th District Lucas No. L-19-1184, 2021-Ohio-1223, at ¶ 50 (Although trial counsel's questioning "may have 'opened the door' to other testimony of [defendant's] bad acts, it did not prejudice the outcome of this case, because it was duplicative of other, more relevant evidence of appellant's abuse of [the victim]").

24.

{¶ 60} Second, Andrews complains that, while cross-examining a sheriff's deputy, trial counsel failed to establish that M.K. was the sender of a suggestive text message to Andrews on October 14, 2021, when M.K. was a Southfield, Michigan hotel room, and allegedly asked if Andrews "was coming to my room."  A copy of a document, purported to be a series of messages sent to Andrews, was introduced at trial by defense counsel, but the document did not include the last two digits of the phone number.  Andrews complains that, by failing to elicit the "full phone number" from the witness, the defense failed to establish M.K. as the sender of the message.  Again, we disagree for the reason that Andrews testified about the exhibit herself, and she confirmed that it was "the text message exchange where [M.K.] texted me on October 14th at 12:52."  Therefore, testimony regarding the "full phone number" would have been duplicative of Andrews's testimony.  Moreover, we cannot say that there would have been a reasonable probability of a different outcome if this one small piece of corroborating evidence had been elicited by trial counsel.

{¶ 61} Third, Andrews faults her trial counsel for failing to object when the prosecutor repeatedly described Andrews as having "tracked" M.K.'s location.  Andrews specifically denied that anyone had engaged in "tracking."  On appeal, Andrews complains that counsel's failure to object allowed the jury to "conclude, incorrectly, that Andrews had been tracking [M.K.'s] phone."  Andrews may not like the term, but she specifically admitted at trial that she reviewed phone records that showed M.K.'s "location."   Given that an objection may have drawn undue attention to Andrews's use of technology to determine M.K.'s location—whether or not such conduct should be

25.

described as "tracking"—trial counsel's decision not to object can be viewed as reasonable trial strategy. *State v. Vulgamore*, 4th Dist Ross No. 19CA3686, 2021-Ohio-3147, ¶ 42.

{¶ 62} Finally, Andrews complains that trial counsel failed to object to a line of questioning regarding her arrest and guilty plea to a charge of telephone harassment in June of 2021. Andrews argues that evidence regarding this conviction was "irrelevant and prejudicial" because it occurred before the time period identified in Counts 2 or 3. Andrews, however, neglects to mention that *she* introduced this evidence under cross-examination when she told the prosecutor, "I want to talk about the June incident." Further, Andrews's counsel *did object* to the June of 2021 criminal proceeding as being "outside the time frame of the criminal charges." Thus, counsel's performance was not deficient.

{¶ 63} In sum, there is no merit to Andrews's assertion that a cumulation of alleged errors by her trial counsel resulted in cumulative error. "[W]hen none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together." *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 170. We find her fourth assignment of error not well-taken.

## IV. Conclusion

{¶ 64} In sum, Andrews's assignments of error are found not well-taken, and the trial court's October 24, 2022 judgment is affirmed.

26.

{¶ 65} But, as noted above, the trial court's judgment entry incorrectly states that Andrews was found guilty in Count 2 of violating "R.C. 2919.27(A)(1)(B)(4)," a felony offense. We therefore remand this matter to the trial court for the limited purpose of issuing a corrected judgment entry indicating that Andrews was convicted of violating R.C. 2919.27(A)(1) and (B)(2), a misdemeanor of the first degree.

{¶ 66} Andrews is ordered to pay the costs of this appeal pursuant to App.R.24.

Judgment affirmed
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.          _____
                                            JUDGE
Christine E. Mayle, J.

                              _____
Myron C. Duhart, P.J.                        JUDGE
CONCUR.

                              _____
                                            JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

27.