[Cite as *State v. Snow*, 2025-Ohio-3104.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No. L-24-1194

    Appellee                                      Trial Court No. CR-23-2933

v.

Roy Snow                                              **DECISION AND JUDGMENT**

    Appellant                                     Decided: August 29, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and,
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Dan M. Weiss, for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant, Roy Snow, appeals the July 29, 2024 judgment of the Lucas County Court of Common Pleas which, following a jury trial convicting him of rape, imposed an indefinite sentence of five to seven and one-half years of imprisonment. For the reasons that follow, the judgment is affirmed.

## I. Facts

{¶ 2} On December 19, 2023, the Lucas County Grand Jury indicted Snow on two counts of rape. Count No. 1 stemmed from an incident on January 11, 2016, involving J.B.; count No. 2, stemmed from an incident on January 1, 2023, involving B.H. Snow pleaded not guilty to the charges.

{¶ 3} The matter proceeded to a jury trial. Toledo Police records custodian Lieutenant Phillip Cook testified that he prepared a copy of the Incident Detail Report, generated from a 911 call on January 1, 2023, at 8:53 p.m., showing crews, including Fire and EMS, were dispatched to the Madonna Homes in Toledo, Lucas County, Ohio. The comments section of the report provided that the caller identified the perpetrator as a security officer with the last name Snow who offered her a ride and assaulted her at an apartment at Page and Lagrange Streets. The report was admitted into evidence.

### A. J.B.

{¶ 4} A Sexual Assault Nurse Examiner (SANE) testified regarding the January 11, 2016 SANE report and test sample kit she prepared following the reported sexual assault of J.B. The report stated that the previous day, J.B. went to Snow's apartment for crack cocaine. After smoking crack, Snow pushed J.B. down on the mattress, made her remove her clothing, and had sex with her without her consent. The report noted no evidence of injuries. The report was admitted into evidence. Police collected J.B's SANE test kit from the hospital and booked it into property at the police station.

{¶ 5} Ohio Bureau of Criminal Investigation ("BCI") forensic scientist, Logan Schepeler, testified that he conducted a DNA analysis of the swabs collected during

2.

J.B.'s SANE exam. The vaginal swabs contained two contributors: J.B. and Snow. Schepeler's March 6, 2023 report summarizing the results was admitted into evidence.

{¶ 6} J.B. testified that she had met Snow two or three times prior to January 2016; at that time, she did not know his name. J.B. stated that she rode from Bowling Green with a male friend to Snow's apartment because she wanted crack. J.B. stated that Snow became aggressive after giving her the crack, pushing and holding her down. She explained that Snow vaginally raped her and that although she could not remember, he must have removed her clothing. She left after Snow fell asleep. After sobering up, she went to the hospital.

{¶ 7} Defense counsel cross-examined J.B. regarding discrepancies in the timing and details of the incident. J.B. agreed that in 2023, she told Detective Herrick that Snow robbed her and her male friend of $400. In 2016, she did not report the robbery to police or the SANE nurse.

### B. B.H.

{¶ 8} Toledo Firefighter/EMT Anthony Pratt testified that on January 1, 2023, he responded by ambulance to the Madonna Homes where B.H. reported that a male raped her earlier that day. She was visibly upset and crying. EMTs transported B.H. to the hospital; they requested a SANE nurse meet them at B.H.'s room.

{¶ 9} Toledo Police Patrol officer Mitchell Cosby testified that on January 1, 2023, he responded to a call at the Madonna Homes. B.H. appeared distraught and traumatized. The State played footage from his body worn camera.

3.

{¶ 10} The SANE nurse treating B.H. testified that she completed a SANE kit consisting of DNA collection swabs; B.H.'s sweatpants were also collected as potential evidence. The nurse stated that B.H. appeared sober, alert, and oriented. The nurse noted vaginal redness consistent with B.H.'s complaint of pain in that area. The nurse read B.H.'s narrative statement into the record.

{¶ 11} B.H. testified that in January1, 2023, she lived at the Madonna Homes and that Snow worked security for the building. At about 6:00 p.m., B.H. decided to walk to McDonald's. Snow pulled up next to her in his car and offered to give her a ride. Snow informed her that he had to stop by his nearby apartment and pick up something for his second job. When they arrived, she went into his apartment because the neighborhood felt unsafe.

{¶ 12} Snow locked the door after they entered his apartment and said: "You know what time it is." B.H. stated that Snow then told her to take off her clothes but leave her bra and shirt on; she did as instructed. He insisted she perform fellatio, despite her repeated requests for him to stop. She stated that Snow had difficulty maintaining an erection but that he ultimately penetrated her vagina and ejaculated. He then told her to get dressed; she put on her pants, shoes and coat. He dropped her off near the Madonna Homes telling her not to say anything and threatening that he had access to the apartment building.

{¶ 13} B.H. called her sister telling her she had been raped and needed to go to her house. Her sister instructed her to call the police. Police and paramedics arrived and they transported her to the hospital. After being examined by the SANE nurse and

4.

receiving prescriptions for the morning after pill and preventative antibiotics, B.H. went to her sister's house. She never returned to live at the Madonna Homes.

{¶ 14} During cross-examination, B.H. agreed that she saw Snow earlier that day but denied making plans to meet him later. She denied arranging to meet Snow away from the Madonna Homes to go to his apartment and denied asking Snow for money or agreeing to have sex with him.

{¶ 15} BCI forensic scientist, David Miller, testified that he authored two reports relating to the 2023 rape investigation. The tests analyzed the rape kit submitted on January 5, 2023, and the DNA standards from Snow dated January 19 and March 21, 2023. Both sets of results concluded that Snow was second contributor of DNA with an estimated frequency of occurrence of less than one in one trillion.

{¶ 16} Toledo Police Detective, Amy Herrick, is assigned to Special Victims Unit (SVU) which investigates crimes of a sexual nature. Herrick investigated the January 1, 2023 reported rape. She interviewed B.H. regarding the events and acquired the notes from the SANE exam. Detective Herrick stated that the versions of the events were consistent.

{¶ 17} Detective Herrick interviewed Snow and he consented to submitting a DNA standard for testing. Detective Herrick stated that when DNA is collected from a suspect and sent for testing, BCI places it on the national DNA database. With Snow's DNA submission, the BCI uncovered a possible match with a 2016 rape investigation. BCI requested police return Snow's DNA standard for further testing. From that, police linked Snow to the 2016 case involving J.B. Detective Herrick then interviewed J.B.

5.

{¶ 18} Based on her training and experience as an SVU detective, Detective Herrick explained that two types of individuals commit rape: preferential and situational offenders. Preferential offenders look for particular traits in a victim while situational offenders simply take advantage of an opportunity. Detective Herick stated that Snow could be considered a "preferential rapist." Counsel objected on the basis that the statement was improper character evidence; the court instructed the State to move on.

{¶ 19} Defense counsel cross-examined Detective Herrick regarding her November 2023 interview with J.B. Herrick agreed that J.B. told her that Snow had robbed her and that the accusation did not appear in either the initial police report or the SANE report.

{¶ 20} Snow testified that he met J.B. through a long-time female friend who brought her to his house. The two smoked crack cocaine and the friend left. J.B. ran out of crack so Snow gave her $50 and a "drug man" delivered more. J.B. asked that if a man came to the door, he say that she was not there. Snow and J.B. had consensual sex and she spent the night; he did not know when she left. An unknown man came by three or four times looking for her.

{¶ 21} Snow stated that he works as a security officer at the Madonna Homes. On January 1, 2023, B.H. propositioned him offering sex for money. He stated that his job prohibited fraternizing with the residents so they planned for him to pick her up at the corner after his shift ended. Snow picked up B.H. agreeing to pay $30 for sex. They went to his apartment, had sex, and he dropped her off a block away from her apartment. Snow denied raping either J.B. or B.H.

6.

{¶ 22} On cross-examination, Snow explained that he previously paid a resident for sex and after dropping her back home, a third individual called and demanded $100 and a six-pack of cigarettes or they would report that he raped her. He complied with their request. Snow claimed that B.H. had a similar extortion scheme.

{¶ 23} During his interview with Detective Herrick, Snow told her that B.H. had been trying to date him since he began working at the Madonna Homes. He told Herrick that he initially did not want to date her because she got people in trouble.

{¶ 24} On January 1, 2023, he agreed to pay B.H. for sex. They met around the corner after his shift ended. Snow drove B.H. to his apartment and she began undressing before they could even get in the door. They had rough, consensual sex initiated by B.H.

{¶ 25} Snow stated that approximately 45 minutes after dropping off B.H., an individual called requesting $100 and that if he did not comply, she would go to the police and the hospital claiming rape. He learned of a recording of B.H. telling Snow's security coworker, who relieved him that evening, how to get money out of him. Snow neither saw or heard the recording nor knew of its whereabouts. He claimed that the colleague wanted $5,000 for the information.

{¶ 26} Snow claimed that both women lied when they testified that he raped them. He stated that J.B. lied to "save face" with her boyfriend and that B.H. lied in an attempt to extort money from him.

{¶ 27} Following closing arguments and jury deliberations, the jury found Snow guilty of raping B.H. and not guilty of raping J.B. This appeal followed sentencing.

7.

## II. Assignments of Error

{¶ 28} Snow raises three assignments of error on appeal:

Assignment of Error No.1: Appellant's counsel was ineffective when he failed to file a motion to sever counts one and two of appellant's indictment.

Assignment of Error No. 2: The trial counsel erred by allowing repeated instances of prosecutorial misconduct which deprived the appellant of his rights to a fair trial and counsel's failure to object was ineffective assistance of counsel.

Assignment of Error No. 3: Appellant's counsel was ineffective when he failed to object to improper prosecutorial statements during closing arguments.

## III. Analysis

{¶ 29} Snow's three assignments of error assert trial counsel's ineffectiveness. In Ohio, a properly licensed attorney is presumed competent. *State v. Haas*, 2025-Ohio-683, ¶ 54 (6th Dist.), citing *State v. Banks*, 2002-Ohio-4858, ¶ 16 (9th Dist.). To prevail on his claim of ineffective assistance of counsel, Snow must demonstrate "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984).

## A. Severance

{¶ 30} Snow's first assignment of error challenges trial counsel's failure to move to sever the counts in the indictment. In general, "[t]wo or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if

8.

the offenses charged . . . are of the same or similar character." Crim.R. 8(A); *State v. Clinton*, 2017-Ohio-9423, ¶ 43. Joinder is favorable as it "conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that occur in successive trials before different juries." *State v. Hamblin*, 37 Ohio St.3d 153, 158 (1988).

{¶ 31} Crim.R. 14 permits a defendant to request severance of the counts in an indictment "'on the grounds that he or she is prejudiced by the joinder of multiple offenses.'" *Clinton* at ¶ 44, quoting *State v. LaMar*, 2002-Ohio-2128, ¶ 49. "A claim of prejudice depends on whether the advantages of joinder and avoidance of multiple trials are outweighed by the right of a defendant to be tried fairly on each charge." *State v. Reynolds*, 2018-Ohio-40, ¶ 31 (6th Dist.). A defendant is charged with "furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus. "But even if the equities appear to support severance, the state can overcome a defendant's claim of prejudicial joinder by showing either that (1) it could have introduced evidence of the joined offenses as "other acts" under Evid. R. 404(B) or (2) the 'evidence of each crime joined at trial is simple and direct.'" *Clinton* at ¶ 44, quoting *State v. Lott*, 51 Ohio St.3d 160, 163 (1990). When the State shows that the evidence of each crime is simple and direct, it is not required to meet the stricter "other acts" admissibility test. *State v. Robinson*, 2010-Ohio-4713, ¶ 24 (6th Dist.), citing *Lott* at 163-164, *State v. Hicks*, 2005-Ohio-6848, ¶ 30, 41 (6th Dist.).

9.

**{¶ 32}** Evidence is "simple and direct" if the jury is capable of segregating the proof required for each offense. *State v. Andrews*, 2023-Ohio-4237, ¶ 40 (6th Dist.), citing *State v. Gravely*, 2010-Ohio-3379, ¶ 40 (10th Dist.). "'Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof.'" *Id.*, quoting *State v. Lewis*, 2010-Ohio-4202, ¶ 33 (6th Dist.).

**{¶ 33}** Reviewing the trial in this matter, the evidence presented by the State to prove J.B.'s and B.H.'s rapes was simple and direct. The charges spanned seven years, the alleged victims testified, and two SANE nurses testified regarding each victim. Snow himself testified regarding the separate events and each victim's distinct motivation for lying. A jury could, and did as evidenced by the differing verdicts, distinguish between the evidence supporting each rape charge.

**{¶ 34}** Because the evidence presented as to each rape charge was "simple and direct," no prejudice resulted from their joinder and the motion to sever would have been denied. Snow's counsel, thus, was not ineffective by failing to request severance.

## B. Prosecutorial Misconduct

**{¶ 35}** Snow's second and third assignments of error similarly claim error in the unobjected to admission of improper and prejudicial statements during the State's rebuttal closing arguments. Snow contends that the State made "unsubstantiated claims" and comments including that defense counsel had "manipulated" the evidence, that Snow was a "sexual predator" disguised as a security guard, that he is a "preferential" and

10.

"predatorial" rapist, a real-life demon, that he opened his apartment for crack smoking, and that when he raped J.B., she did not even know his name.

{¶ 36} The test for prosecutorial misconduct "'is whether the prosecutor's conduct at trial was improper and whether it prejudicially affected the substantial rights of the defendant.'" *State v. Carswell*, 2023-Ohio-4574, ¶ 42, (6th Dist.), quoting *State v. Holbrook*, 2015-Ohio-4780, ¶ 32 (6th Dist.), citing *Lott*, 51 Ohio St.3d at 165. "'Important considerations are whether the misconduct was an isolated incident or a protracted series of improper arguments, whether the defendant objected, whether curative instructions were given, and whether the evidence of guilt was overwhelming.'" *State v. Norales-Martinez*, 2018-Ohio-4356, ¶ 32 (6th Dist.), quoting *State v. Oviedo*, 1997 WL 525087, *2 (6th Dist. Aug. 15, 1997).

{¶ 37} A prosecutor is given wide latitude during closing arguments, *State v. Boles*, 2009-Ohio-512, ¶ 47 (6th Dist.), citing *State v. Ballew*, 76 Ohio St.3d 244 (1996), and may "comment freely on 'what the evidence has shown and what reasonable inferences may be drawn therefrom.'" *Id.*, quoting *Lott* at 165. A prosecutor "must 'avoid insinuations and assertions which are calculated to mislead the jury,' must not 'express his personal belief or opinion . . . as to the guilt of the accused' and cannot 'allude to matters which will not be supported by admissible evidence.'" *State v. Steed*, 2016-Ohio-8088, ¶ 48 (6th Dist.), quoting *State v. Smith*, 14 Ohio St.3d 13, 14 (1984).

{¶ 38} Snow's failure to object to the prosecutor's statements, waives all but plain error. *State v. Searfoss*, 2019-Ohio-4619, ¶ 141 (6th Dist.), citing *State v. Smith*, 2015-Ohio-2977, ¶ 63 (6th Dist.), citing *State v. Diar*, 2008-Ohio-6266, ¶ 139. Plain error is

11.

defined as only those errors that affect substantial rights. Crim.R. 52(B). Under the plain error standard, the court may reverse only if its is clear that the defendant would not have been convicted in the absence of the allegedly improper conduct. *Searfoss* at ¶ 142.

### 1. Statement that defense counsel manipulated the evidence

{¶ 39} Snow first claims misconduct in the statement: "They're trying to work with the evidence and manipulate it in a way to make you not see the truth to not come to the conclusion that Roy Snow raped those two females."

{¶ 40} While "manipulate" may have been a strong word choice, the State was commenting on defense counsel's closing and his attempts to create doubt in the juror's minds by offering alternate theories of the victims' motivations and highlighting inconsistencies in the testimony. The prosecutor did not commit misconduct.

### 2. Comments that Snow is a preferential and predatorial rapist, a sexual predator, and a demon.

{¶ 41} The prosecutor's comments that Snow is a preferential or predatorial rapist stem from Detective Herrick's testimony explaining that two types of individuals, situational and preferential, commit rape. Herrick stated that she considered Snow a preferential rapist; defense counsel objected on the basis of improper character evidence and the court instructed the State to move on. Detective Herrick further explained that a preferential offender looks for something specific in their victims. Herrick stated that here, it was drug and or mental health issues. Thus, the statements were not improper.

{¶ 42} The prosecutor's statement characterizing Snow as a demon was arguably improper, though not prejudicial. *See State v. Bedford*, 39 Ohio St.3d 122, 127 (1988)

12.

(The court found no prejudice where the prosecutor called the defendant a demon.). Snow cannot demonstrate that absent the statement he would have been acquitted of raping B.H. B.H. testified that Snow raped her. In addition, the trial court instructed the jury that closing arguments "are not evidence, not to be considered by you as evidence."

## 3. Comments characterizing Snow's apartment as a place where random people can smoke crack.

{¶ 43} The prosecutor stated: "You need to get high? Where do you go? Roy Snow's apartment in the North End on Lagrange Street. Come smoke crack at my apartment."

{¶ 44} Snow testified that J.B. and her friend came to his house to smoke crack. He was then asked whether people come over to his apartment to smoke crack. Snow stated "I live in a drug infested area. I know a lot of people." He stated that both women were addicts and that he knows a lot of people who sell crack. Snow gave J.B. money three times to purchase crack, he arranged the transaction, and had the crack delivered to his apartment. Because the prosecutor's statement has support in the record, it was not improper.

### 4. Comment that J.B. did not know Snow's name when he raped her.

{¶ 45} The comment aligns with evidence presented at trial. J.B testified that she did not know Snow's name on the date of the alleged rape. Thus, there was no misconduct.

{¶ 46} Upon consideration of the comments at issue, Snow was not deprived of a fair trial and the prosecutor did not engage in misconduct. Further, counsel was not

13.

ineffective in failing to object to the comments. Snow's second and third assignments of error are not well-taken.

## IV. Conclusion

{¶ 47} Based on the foregoing, the judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, Snow is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.

JUDGE

Myron C. Duhart, J.

JUDGE

Charles E. Sulek, P.J.
CONCUR.

JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.