[Cite as *State v. Carswell*, 2023-Ohio-4574.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

State of Ohio                           Court of Appeals No. S-22-018

         Appellee                      Trial Court No. 19CR70

v.

Andrew R. Carswell                  **DECISION AND JUDGMENT**

         Appellant                    Decided:  December 15, 2023

* * * * *

Beth A. Tischler, Sandusky County Prosecuting Attorney, and
Alexis M. Otero, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**SULEK, J.**

**{¶ 1}** Appellant, Andrew Carswell, appeals from the judgment of the Sandusky County Court of Common Pleas, dismissing his March 22, 2021 Petition to Vacate or Set Aside Sentence and Conviction Pursuant to R.C. 2953.21.  For the reasons that follow, the trial court's judgment is affirmed in part and reversed in part.  This matter is

remanded to the trial court for a hearing on the first cause of action set forth in Carswell's petition.

**Statement of the Case**

{¶ 2} Carswell was indicted by the Sandusky County Grand Jury on January 18, 2019, with one count of rape, two counts of gross sexual imposition, and one count of importuning.

{¶ 3} Following a two-day trial that began on December 9 and ended on December 10, 2019, the jury convicted Carswell of one count of gross sexual imposition, importuning, and rape. The trial court merged the convictions for gross sexual imposition and rape, and then sentenced Carswell to serve 15 years to life in prison for the offense of rape. The trial court sentenced Carswell to serve three years in prison for the offense of importuning. The sentences were ordered to run consecutively, for an aggregate sentence of 18 years to life in prison.

{¶ 4} Carswell appealed, and on September 24, 2021, this court affirmed the judgment of the trial court. On October 4, 2021, Carswell filed a motion to certify a conflict, and on October 5, 2021, he filed a motion for reconsideration. This court denied Carswell's motion for reconsideration on December 9, 2021, and denied his motion to certify a conflict on January 28, 2022. Carswell then sought the jurisdiction of the Supreme Court of Ohio to review this court's decision of his appeal, however jurisdiction was declined on April 27, 2022.

2.

**{¶ 5}** On March 22, 2022, Carswell filed in the trial court a Petition to Vacate or Set Aside Sentence and Conviction Pursuant to R.C. 2953.21, wherein he asserted ten causes of action. The trial court dismissed Carswell's petition by judgment entry journalized on July 19, 2022. It is from this dismissal that Carswell currently appeals.

## Statement of Facts

## Trial

**{¶ 6}** At trial, 8-year-old L.Y. testified that Carswell, who is married to her cousin, occasionally stays at her family's house during the holidays. She stated that on the evening of Thanksgiving, November 22, 2018, she and Carswell were alone in her basement watching a movie, when Carswell asked her to change into a nightgown so he could give her a massage. Carswell and L.Y. were lying together on the air mattress, with Carswell's stomach facing L.Y.'s back, when he started massaging her shoulders and then her feet. Next, he began touching her vagina. L.Y. testified that his finger went inside her vagina, and that it hurt. She said he was breathing heavily and sweating, while, with one hand, alternately licking his finger, touching his penis, and then touching L.Y.'s vagina. With his other hand, he was holding his underwear down, exposing his genitals. Carswell asked L.Y. to kiss his penis, and L.Y. refused. The massage ended when L.Y. asked to get a snack. Carswell followed L.Y. to the kitchen and spoke with other family members. L.Y. testified that while Carswell was talking to relatives, she went upstairs into her sister's room and told her sister, 10-year-old R.Y., what had happened. L.Y. stated that she was scared because she "pinky promised" not to tell and because Carswell

3.

had threatened to put guns and knives in her Christmas presents if she did tell. After brief discussion, the sisters decided to go to their cousin A.R.'s room.

{¶ 7} A.R., an adult, testified that she had been asleep when the girls rushed into her room and told her something bad had happened. L.Y. was crying as she recounted her story to A.R. A.R. summoned L.Y.'s mother, A.Y., into the room and informed her of the situation. A.R. testified that she did not talk to Sheriff's deputies that night, but that she did talk to Detective Arp at a later time.

{¶ 8} A.Y. testified that after Thanksgiving dinner, Carswell went "Black Friday" shopping with the family, while L.Y. stayed at home with her father, A.Y.'s husband, J.Y. The parties returned from shopping around 9:30 p.m., and Carswell retreated to the guest room in the basement. A.Y. testified that at the top of the stairs leading to the basement was a baby gate with a pressure-operated foot pedal latch, which "makes, like a screeching noise when it opens." She stated that the gate is always kept shut in order to keep the dog out of the basement, and that if the gate were not kept closed, the dog would be able to knock it over, as the gate is only loosely attached to the walls by "little things almost like a shower curtain that you have to squeeze tight to hold it on the top." According to A.Y., the noise of the gate being opened could be heard by someone in the basement.

{¶ 9} At trial, A.Y. recalled that when L.Y. came up the stairs on Thanksgiving night, Carswell was right behind her and remained in close proximity to her as he helped her get milk and cookies. She further testified that L.Y. having a snack so late in the

4.

evening was not part of L.Y.'s normal routine. When A.Y. went upstairs for bed that night, she was pulled into A.R.'s room, where her daughters were crying. L.Y. said "I'm sorry, mommy" and told her what had occurred in the basement. A.Y. testified that she immediately called law enforcement, although at trial she could not specifically recall whether she dialed 911 or called the Sandusky County Sheriff's Department. A.Y. also testified that she had previously worked as the Deputy Director of Children Services for Erie County.

{¶ 10} Deputies Darling and Ray each testified that at around 11:30 p.m., on November 22, 2018, they received a call to respond to a sexual assault involving a minor. The officers were met at the residence by L.Y.'s parents and another relative. Due to the nature of the incident, the officers did not take any statements from the parties. Instead, they called Detective Sergeant Arp to the scene.

{¶ 11} Arp testified that after he arrived on scene and informed Carswell of the allegations. Carswell stated that while he was spooning with L.Y., alone in the basement, he had a vivid dream that he was rubbing his wife's vagina. He admitted that touching may have been possible, but he did not remember it occurring. Carswell's wife confirmed that these dreams and subsequent groping have occurred in the past. Arp stated that after he finished speaking with Carswell, he escorted him to Darling's cruiser. He also strongly suggested to L.Y.'s mother that she take L.Y. to be examined by a S.A.N.E. nurse as soon as possible.

5.

**{¶ 12}** Sexual Assault Nurse Examiner ("S.A.N.E. nurse") Amanda McCall, testified that a day after the incident, on November 23, 2018, she conducted a sexual assault examination on L.Y. The exam consisted of an interview, a head-to-toe analysis, and an external swabbing of L.Y.'s vaginal and perianal area. There were no physical findings as a result of the exam and McCall concluded that this was consistent with the facts that L.Y. had disclosed.

**{¶ 13}** Angela Wheeler, an investigator for Sandusky County Children Services, testified that an investigation of the incident was opened on November 26, 2018. In connection with the investigation, she scheduled a home visit with the family, during which she met the family and "just ma[d]e face-to-face contact with the child." From there, she set up a forensic interview with L.Y. that occurred on November 30, 2018. Based on L.Y.'s intelligence, eye contact, and responsiveness during the interview, Wheeler concluded that this case was "indicated," meaning that the child said the incident happened and the perpetrator said that it did not. Wheeler reported her conclusion to law enforcement.

**{¶ 14}** Lindsey Nelsen-Rausch, a forensic scientist employed at the Ohio Bureau of Criminal Investigations ("BCI"), testified about DNA analysis that was conducted on L.Y.'s underwear and on samples taken from L.Y.'s sexual assault examination with McCall. All vaginal samples were attributable to L.Y. Additional data from the perianal area contained male DNA that was otherwise uninterpretable because the sample was "just not enough," and so Nelson-Rausch was unable to determine whether the male

6.

DNA that was found on L.Y.'s body belonged to Carswell or to someone else. Underwear samples, including samples from the interior back panel, interior crotch, interior front panel, exterior back panel, and exterior front panel to mid-crotch, all had DNA consistent with Carswell. A swab from the interior front panel contained additional DNA that was uninterpretable, even as to gender, because there was not enough of it to make a comparison.

{¶ 15} Defense counsel cross-examined Nelsen-Rausch regarding the possibility of there being an innocent transfer of DNA to a pair of underwear as the result of the wearer sitting on an object that someone else had touched. Nelson-Rausch testified that such a transfer was possible. Defense counsel also cross-examined Nelsen-Rausch as to the possibility of moisture from the DNA testing process being able to draw DNA from the outside of the underwear fabric to the inside. Nelsen-Rausch testified that she thought this would be unlikely, but she could not be sure.

{¶ 16} After the state rested its case, counsel for both sides made closing arguments. Carswell's defense was that the victim had fabricated her allegations. Addressing the DNA evidence, defense counsel argued that the (uninterpretable) male DNA evidence from L.Y.'s perianal area raised the question of the existence of a different abuser. He further argued that the existence of Carswell's DNA in and on L.Y.'s underwear was due to innocent transfer. Specifically, he stated,

> [L.Y.] was laying on her stomach, facing the TV on the bed
> that Andrew Carswell had been sleeping in. His DNA was all

7.

over the bed. Absolutely it got under her panties. She's wearing a short little nightgown.

{¶ 17} During deliberations, the jury posed the question, "[i]f someone is dreaming and commits a crime, does that in any way make them less guilty of the crime?" The trial court responded by re-reading its jury instruction containing the definition of "knowingly" and "purpose."

{¶ 18} Ultimately, the jury found appellant guilty of gross sexual imposition for the November 22, 2018 incident, importuning, and rape. The jury returned a verdict of not guilty on the second count of gross sexual imposition, which was for a separate incident that was alleged to have occurred on October 6, 2018.

**Petition to Vacate or Set Aside Sentence Pursuant to R.C. 2953.21**

{¶ 19} Carswell's petition to vacate or set aside sentence and conviction set forth ten "causes of action." Carswell argues in his "First Cause of Action" that trial counsel was ineffective for failing to investigate and challenge DNA evidence through expert testimony. Specifically, Carswell argues that trial counsel failed to use the testimony of his previously retained expert, geneticist Gregory Hampikian, Ph.D., "to provide a proper context to the jury regarding the probability that the DNA found on the panties came from innocent transfer" and to provide testimony that the DNA results "were non-conclusive, unreliable and confusing for use in determining guilt." Carswell supports this cause of action with an affidavit by Hampikian and with an affidavit by attorney Loren J. Zaner.

8.

{¶ 20} Carswell argues in his "Second Cause of Action" that trial counsel was ineffective for failing to research, consult with or use a child interviewing expert. Specifically, he states that "[t]he issue of contamination and outside influences on the child were not explored by defense counsel which affected the reliability of the accusations and failed to give the jury material information for their use in assessing the credibility of L.Y.'s testimony." Carswell supports this cause of action with Zaner's affidavit and an affidavit by forensic psychologist Susan B. Cave, Ph.D.

{¶ 21} The "Third Cause of Action" asserts that trial counsel was ineffective for failing to know, understand or research applicable law concerning volitional acts and Ohio's "Blackout" jury instruction. According to Carswell, such an instruction would have been "the proper response to the jury's question concerning whether sleeping would mitigate against guilt." Carswell supports this cause of action with affidavits by Zaner and by Carswell's roommate, Robin Helton, and with a magazine article containing a discussion about voluntariness, parasomnia, and Ohio's blackout defense.

{¶ 22} In his "Fourth Cause of Action," Carswell claims that trial counsel was ineffective for failing to consult with or call an expert witness to testify as to parasomnia. According to Carswell, "[t]he issue was critical to the jury as evidence [sic] by their note sent to the trial judge during deliberation. Not presenting evidence of parasomnia was objectively unreasonable and prejudicial to the petitioner." Carswell supports this cause of action with the affidavits of Zaner and Helton.

9.

{¶ 23} Carswell's "Fifth Cause of Action" sets forth a claim that trial counsel was ineffective for failing to "review body camera footage and engage in meaningful cross examination concerning the nearly two (2) hours of Body Camera video that should have been available from the deputies on scene per Department policy, but was not disclosed." Carswell states that this failure, "in light of large unexplained gaps comprising nearly two (2) hours of inexplicably missing footage in the [Body Worn Video ("BWV")] footage, a violation of department policy for which the deputies could have been disciplined, undermines any fair and just confidence in the verdict." This cause of action is supported with the affidavits of Helton and Zaner; a digital file containing BWV clips; spreadsheets and a timeline detailing each deputy's BWV, the length of each clip, and the time gap between each clip; Public Records Disclosure of Incident Reports; Sheriff's Department BWV policy; and an article on ex-prosecutor Tim Braun.

{¶ 24} The "Sixth Cause of Action" maintains that trial counsel was ineffective for failing to prosecute discovery and acquire missing BWV video or obtain an explanation for its lack of preservation. According to Carswell, had trial counsel conducted this sort of investigation, it would have been possible to: (1) lay a proper foundation to challenge the credibility of the notion that, over the course of 2 hours and nearly thirty minutes, no one in law enforcement even checked on the physical condition of the complainant (L.Y.) or had any interaction with her"; (2) challenge A.R.'s testimony that she did not talk to deputies on the night of the incident; and (3) inform the jury of evidence of "conflicts of interest and bias" resulting from L.Y.'s mother having "personal friendships with some of

10.

the police officers, the head of Children's Services and the SANE nurse (Amanda McCall)." This cause of action is supported with Zaner's affidavit, Cave's affidavit, and various BWV video clips and transcripts.

{¶ 25} Carswell argues in his "Seventh Cause of Action" that trial counsel was ineffective for failing to cross examine based upon facts available in the disclosed video. In particular, Carswell claims that Darling should have been cross-examined about claims that he was not present when A.R. "was relaying her story," and that L.Y.'s mother, A.Y., should have been cross-examined about her "name dropping of connections to pertinent officials" and about her failure to take L.Y. to a S.A.N.E. nurse on the night of the incident. Carswell supports this cause of action with the Zaner affidavit and with various BWV video clips and transcripts.

{¶ 26} In his "Eighth Cause of Action," Carswell alleges "Prosecutorial Misconduct for lack of candor to the Court, failure to provide exculpatory evidence pursuant to *Brady v. Maryland* and or *Giglio v. United States*, and the knowing misrepresentation of law to the Court." Specifically, Carswell alleges that when the jury sent the note to the court asking if being asleep made Carswell any less guilty, Prosecutor Mulligan falsely indicated to the court that it should repeat its mens rea instruction because "there's no other instruction to give." According to Carswell, Mulligan had to have known that there was an established instruction on blackout/sleep in Ohio, but he "misled the Court which then issued a prejudicially deficient jury instruction that led to [Carswell's] convictions." Carswell additionally states that Prosecutors Braun and

11.

Mulligan failed to "turn over some [BWV] videos that contained impeachment evidence against most of [their] witnesses." In particular, Carswell points to "large unexplained gaps as well as editing that was done" on provided videos. Carswell also points to a single page of incident reports not disclosed in discovery that contains both the exact time of Arp's arrival on scene as well as documentation that the initial call was not to 911, but to the non-emergency line. According to Carswell, this page is material in that: (1) it presents evidence contrary to the testimony of Det. Arp as to his arrival and overall time on scene; (2) it would have generally impeached the notion that the encounter between Arp and the family the night of the incident was brief and immaterial; and (3) it would have impeached the notion that no one saw or talked to either L.Y. or R.Y. on the night of the incident. This cause of action is supported with Zaner's affidavit; Public Records Disclosure of Incident Reports; a Paper Discovery Answer; BWV videos; and spreadsheets and a timeline detailing each deputy's BWV, the length of each clip, and the time gap between each clip.

{¶ 27} Carswell's "Ninth Cause of Action" alleges "Prosecutorial Misconduct for eliciting testimony when it knew or should have known that the testimony of several key witnesses was false or not candid." Carswell asserts that the state elicited "extensive false testimony" regarding the gate that led to the basement, specifically that it made a "loud noise" when opened and that it "could not" be left open. Carswell further claims that the state elicited "extensive false testimony" from A.R. that she "did not talk" to either of the deputies or to Arp on the night of the incident. Finally, Carswell claims that false

12.

testimony was elicited from Angela Wheeler, the investigator who interviewed L.Y., when she testified that "it is part of her process to meet children prior to interviewing them, but that she does not go into the allegations at all."

{¶ 28} The "Tenth Cause of Action" asserts that "[i]ndividually and collectively, the errors committed by the Prosecutor and Petitioner's Trial Counsel prejudiced the Appellant's right to a fair trial."

{¶ 29} The trial court dismissed Carswell's petition without a hearing, in a decision and entry journalized on July 19, 2022. In rejecting the claim of ineffective assistance of trial counsel, the trial court held Carswell to the standard established in *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Addressing trial counsel's performance, the trial court stated generally:

> The Court has made a careful review of the records in the case and it is clear that trial counsel pursued issues related to discovery, made coherent, rational arguments concerning evidentiary issues and rigorously cross-examined the witnesses in the case. The Defendant did not call witnesses and chose not to testify. These are all examples that trial counsel competently addressed the issues present in this case and made sound strategic trial decisions.

As for Carswell's claims against trial counsel's performance, the trial court stated:

> Defendant's First, Second, Third, Fourth, Sixth and Seventh causes of action fail both tests when applying *Strickland* as second guessing the strategic decisions of trial counsel does not rise to a level of incompetence. The supporting documentation is clearly 'armchair quarterbacking' trial counsel's decisions made during the course of the trial.

13.

\* \* \* The nine year old victim testified at the trial in this matter and directly implicated the Defendant for the crimes for which he was convicted. Nothing presented in this Petition comes close to showing that the jury would have been otherwise impacted.

The Fifth cause of action is premised on 'unavailable bodycam footage' and clearly fails as there is no clear evidence to establish that either the bodycam footage exists or that it would have had an impact on the trial.[1] Any bodycam footage would not directly concern the allegations contained in the indictment, rather, it would reflect the course of the investigation of the incident.

Defendant's Tenth cause of action fails for the same reasons indicated above.

{¶ 30} Regarding the causes of action alleging prosecutorial misconduct, the trial court merely stated that it had reviewed Carswell's claims and found no merit in his arguments and "absolutely no clear evidence that the outcome of the trial would have been different." It is from this decision that Carswell currently appeals.

---

[1] Regarding the "unavailable" bodycam footage, the trial court states in its decision that "Exhibit K is contained on a thumb drive submitted to the Court and under the file, 'Exhibit K' there are no files marked as 'camera uploads' referenced in Defendant's Petition. The Court stopped looking for the file as it is apparent that numerous other items are on the thumb drive including items identified as 'Audio of Interview with Andrew Carswell', 'Audio of phone call conversation…', among others contained within 'Exhibit K.'"

## Assignments of Error

{¶ 31} Carswell asserts the following assignments of error on appeal:

> I. Andrew Carswell was entitled to Summary Judgment in this case, there is no legitimate issue of material fact, and the right to Summary Judgment appears on the face of the record.
>
> II. The trial court erred in granting Summary Judgment to the State and dismissing the Petition without a hearing.

## Analysis

{¶ 32} Carswell argues in his first assignment of error that he was entitled to summary judgment in this case. He argues in his second assignment of error that the trial court erred in "granting summary judgment to the state" and in dismissing his petition without a hearing. As the issues involved in these two assignments of error overlap, they will be considered together in this analysis.

{¶ 33} Summary judgment will be granted only when "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact," show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). "The burden of showing that no genuine issue of material fact exists falls upon the party who moves for summary judgment." *Wright-Patt Credit Union, Inc. v. Byington*, 6th Dist. Erie No. E-12-002, 2013-Ohio-3963, ¶ 9. "[O]nce the movant supports his or her motion with appropriate evidentiary materials, the nonmoving party 'may not rest upon the mere

15.

allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" *Id.*, quoting Civ.R. 56(E).

{¶ 34} In this case, the trial court did not enter summary judgment in favor of the state, as Carswell suggests. Instead, it dismissed the petition without a hearing. Thus, the focus of our review centers upon the question of whether the trial court should have granted a hearing in the matter.

{¶ 35} Before granting a hearing on a timely postconviction petition, the trial court must "determine whether there are substantive grounds for relief." R.C. 2953.21(D). "If the petition 'is sufficient on its face to raise an issue that the petitioner's conviction is void or voidable on constitutional grounds, and the claim is one which depends upon factual allegations that cannot be determined by examination of the files and records of the case, the petition states a substantive ground for relief.'" *State v. Bunch*, -- Ohio St.3d --, 2022-Ohio-4723, --N.E.3d--, ¶ 23, quoting *State v. Milanovich*, 42 Ohio St.2d 46, 325 N.E.2d 540 (1975), paragraph one of the syllabus.

{¶ 36} When determining whether the petition states a substantive ground for relief, the trial court must consider "the entirety of the record from the trial proceedings as well as any evidence filed by the parties in postconviction proceedings." *Bunch* at ¶ 24, citing R.C. 2953.21(D). Where the record on its face shows that the petitioner is not entitled to relief, the trial court must dismiss the petition. *Id.*, citing R.C. 2953.21(D) and (E). But where the record "does not on its face disprove the petitioner's claim, * * * the

court is required to 'proceed to a prompt hearing on the issues.'" *Id.*, citing R.C. 2953.21(F). (Additional citation omitted.)

{¶ 37} "An abuse of discretion standard applies to decisions granting or denying post-conviction relief, 'including the decision whether to afford the petitioner a hearing.'" *State v. Wright*, Miami No. 2022-CA-27, 2023-Ohio-2895, ¶ 22, quoting *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 51-52 and 58. "Applying the wrong legal standard in a postconviction proceeding is also reversible error under an abuse-of-discretion standard." *Bunch* at ¶ 25; *see also Wright* at ¶ 23.

{¶ 38} We additionally note that "[t]he presentation of competent, relevant, and material evidence outside the trial record may defeat the application of res judicata." *State v. Froman*, 12th Dist. Warren No. CA2020-12-080, 2022-Ohio-2726, ¶ 24, citing *State v. Lawson*, 103 Ohio App.3d 307, 315 (12th Dist.1995). "The petitioner can avoid the bar of res judicata by submitting evidence outside the record on appeal that demonstrates that the petitioner could not have raised the claim based on information in the original record." *Id.*

### Ineffective Assistance of Counsel

{¶ 39} Carswell's first seven causes of action involve claims of ineffective assistance of counsel. "To show that trial counsel was ineffective, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *Bunch* at ¶ 26, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Regarding the prejudice prong, the defendant must

17.

prove that there is a 'reasonable probability' that counsel's deficiency affected the outcome of the defendant's proceedings." *Bunch* at ¶ 26, citing *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Bunch* at ¶ 26, quoting *Strickland* at 694. "'When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Bunch* at ¶ 26, quoting *Strickland* at 695.

{¶ 40} Where, as here, examination of the ineffective assistance claim is related to a decision about whether to grant a hearing on a postconviction petition, the postconviction petition "need not definitively establish" counsel's deficiency or any resulting prejudice to the defendant. *Bunch* at ¶ 27. "Instead, the petition must be sufficient on its face to raise an issue whether [the defendant] was deprived of the effective assistance of counsel, and [the defendant's] claim [must depend] on factual allegations that cannot be determined by examining the record from his trial." *Id.* The evidence provided, if true, must "set out a prima facie case that [the petitioner] was deprived of his constitutional right to the effective assistance of counsel." *Id.* at ¶ 45.

{¶ 41} We note that "[i]n the present context of postconviction litigation, it is possible and appropriate to question whether a trial counsel's decisions were in fact deliberate and strategic and whether strategic decisions were reasonable ones." *Bunch* at ¶ 36. Although "[t]rial strategy is usually within the 'wide range of reasonable

18.

professional assistance,'" "strategy is not synonymous with reasonableness." *Id.*, citing *Strickland* at 689.

### Prosecutorial Misconduct

{¶ 42} Carswell's Eighth and Ninth causes of action involve claims of prosecutorial misconduct, both for failure to turn over exculpatory evidence and for eliciting false testimony. "The two-fold test for prosecutorial misconduct is whether the prosecutor's conduct at trial was improper and whether it prejudicially affected the substantial rights of the defendant." *State v. Holbrook*, 6th Dist. Huron No. H-14-003, 2015-Ohio-4780, ¶ 32, citing *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990).

{¶ 43} "A criminal defendant's due process rights are violated if the prosecution suppresses evidence favorable to the accused, irrespective of the prosecution's good or bad faith." *State v. Carroll*, 6th Dist. Lucas No. L-05-1362, 2007-Ohio-5313, ¶ 69, citing *State v. Johnston*, 39 Ohio St.3d 48, paragraph four of the syllabus, following *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.  The prosecution has a duty to disclose evidence that is both favorable to the accused and material either to guilt or to punishment. *State v. Norman*, 2013-Ohio-1908, 992 N.E.2d 432, ¶ 54 (10th Dist.), citing *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), *Brady* at 87, and Crim.R. 16(B).

{¶ 44} "'In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a

19.

reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Carroll* at ¶ 70, quoting *Johnston*, paragraph five of the syllabus, following *Bagley*. "Where the undisclosed evidence would have resulted in the impeachment of the prosecution's main witness, undermining his credibility, the evidence is by and large material." *Carroll* at ¶ 72, citing *United States v. Shaffer*, 789 F.2d 682, 688-689 (9th Cir. 1986). Similarly, the state may not knowingly use false testimony to obtain a conviction, even if that false testimony goes only to the credibility of the witness. *Carroll* at ¶ 72.

## Application of Incorrect Standards

{¶ 45} In *Bunch*, the Supreme Court of Ohio faulted both of the lower courts in that case because they "failed to apply the proper standard for reviewing whether a hearing was required on [the defendant's] postconviction ineffective-assistance claim and instead treated [the claim] as one on the merits in a direct appeal." *Bunch* at ¶ 29. The failure was in holding the defendant to "the standard of proving that 'the outcome of the proceedings would have been different but for counsel's deficient performance.'" *Id.* at ¶ 28, quoting *State v. Bunch*, 7th Dist. Mahoning No. 18 MA 0022, 2021-Ohio-1244, ¶ 23. Instead, the Court held that "Bunch was required to raise in his petition a triable issue of fact, supported by evidence outside the record, whether his trial counsel was deficient and whether that deficiency prejudiced him." *Id.* at ¶ 37. "Bunch's evidence, if true, must show that trial counsel's actions were not reasonable 'under prevailing professional

norms,' * * * and that 'there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" (citations omitted.) *Id.*

{¶ 46} In the instant case, the trial court likewise appears to have applied the wrong standard. Here, rather than determining whether the petition was sufficient on its face to raise an issue whether Carswell was deprived of the effective assistance of counsel, the trial court simply rejected the arguments in Carswell's petition as "second guessing the strategic decisions of trial counsel." And instead of determining whether Carswell's claims depended on factual allegations that could not be determined by examining the record from his trial, the trial court summarily dismissed Carswell's supporting documentation as "'armchair quarterbacking' trial counsel's decisions made during the course of the trial." Finally, the trial court seems to have held Carswell to the standard of proving that the outcome of the proceedings would have been different but for counsel's deficient performance when it concluded that "[n]othing presented in this Petition comes close to showing that the jury would have been otherwise impacted." In all of these determinations, the trial court incorrectly failed to distinguish between standards that are appropriate in direct appeals and those that are to be applied when determining whether a postconviction hearing should be held.

{¶ 47} The same mistake appears in connection with Carswell's claims of prosecutorial misconduct. Instead of determining whether Carswell provided sufficient operative facts to warrant an evidentiary hearing on those claims, the trial court simply

21.

determined that there was "no clear evidence that the outcome of the trial would have been different."

{¶ 48} Turning now to the content in Carswell's brief, we will address his causes of action in order.

**First Cause of Action**

{¶ 49} Carswell argues in his "First Cause of Action" that trial counsel was ineffective for failing to investigate and challenge DNA evidence through expert testimony. Specifically, Carswell contends that trial counsel failed to use the testimony of his previously retained expert, geneticist Gregory Hampikian, Ph.D., "to provide a proper context to the jury regarding the probability that the DNA found on the panties came from innocent transfer" and to provide testimony that the DNA results "were non-conclusive, unreliable and confusing for use in determining guilt."

{¶ 50} According to Hampikian's report, "the state lab analyst Nelsen-Rausch *falsely testified* that the interior back panel of the underwear is a mixture of two people," Carswell and L.Y. (Emphasis added.) He goes on to state that "[i]n order to make this conclusion, the state lab analyst ignores very clear DNA peaks (alleles) that cannot be attributed to L.Y. or Mr. Carswell, for example the 19 allele at D2S1338." Explaining the significance of this discrepancy, Hampikian states:

> [t]he DNA alleles identified from the underwear swab, referred to by Nelsen-Rausch as 'not interpretable' 'data' actually definitively show that human DNA from a person or persons not Mr. Carswell or L.Y. contributed DNA to the swab from the inside of the panties. This finding supports the

22.

argument that some DNA unrelated to an assault is found in the underwear. I do not think that defense counsel cross examined Nelsen-Rausch effectively concerning this very important point, a third contributor to the underwear.

{¶ 51} He further states that:

[t]his is an important point for the jury to understand. It means that to accept the state's theory that DNA from Mr. Carswell and L.Y. are in the underwear, we must also accept that at least one more person contributed to the underwear. This fact is important to the defense contention that innocent transfer of DNA to the "interior of the panties" swab is not only possible but required by the State's theory that L.Y. and Mr. Carswell contributed DNA to the swab from the interior back panel of the underwear.

{¶ 52} Hampikian also attested to the possibility of wet-swab transference resulting from the DNA testing process itself, which Nelsen-Rausch could not confirm on cross examination. Specifically, he stated:

In order to swab the underwear interior for DNA the state analyst Nelsen-Rausch first wet a cotton swab, then applied it to the area of the underwear, rubbing and wicking the DNA into the swab. In order to support the defense contention that Mr. Carswell's DNA was originally on the outside of the underwear, defense attorney O'Brien attempted to solicit an answer from Nelsen-Rausch regarding the possibility of DNA transfer from the outside of the underwear through wicking by the wet swab. This is a reasonable scientific explanation for the transfer of cells and dissolved DNA, and such wicking is, in fact, part of the reason that wet cotton swabs are used by crime labs. The [state's] analyst appears to hesitate in her response, and then expresses skepticism that DNA transfer by wicking is possible.

* * *

23.

Had I been at trial, I would have indicated to the defense that wicking can transfer DNA transfer, and that this is an important point for the jury to understand.

{¶ 53} Hampikian further testified that an additional potential source of innocent DNA transfer was in the form of a tear in the crotch area of the underwear, and that, had he been at trial, he "would have reminded counsel of this fact, and could have testified regarding the increased opportunity for DNA transfer in areas of the skin not covered by cloth."

{¶ 54} Although Hampikian was originally retained by trial counsel to review the DNA results, charts and reports furnished by the Ohio Bureau of Criminal Investigation, he was not asked by trial counsel to write an expert report, to attend the trial as a consultant, or to testify. Carswell argues that this was "due to trial counsel's misunderstandings of Hampikian's findings that the DNA findings were innocent transfer."

{¶ 55} "[W]hen the core of a defendant's claim or defense turns on evidence that cannot be properly provided to a jury without the use of expert testimony, the failure to engage experts can * * * constitute deficient performance." *Bunch*, 171 Ohio St.3d 775, 2022-Ohio-4723, at ¶ 40.

{¶ 56} The trial turned not just on the credibility of L.Y., but also on the reliability and credibility of the state's expert on DNA evidence, whose testimony provided the only independent physical evidence and was critical to the state's case. Hampikian's testimony describes evidence of a third person's DNA in the interior back panel of the underwear,

24.

contradicting Nelsen-Rausch's suggestion that there were only two. He also describes two previously unmentioned or unsubstantiated potential vehicles for innocent DNA transfer in this case, including wicking from testing and a hole in the underwear. Such evidence, which could not be determined by examining the record from trial, was sufficient to raise an issue as to whether Carswell was deprived of the effective assistance of counsel for failing to use expert testimony. For this reason, the trial court erred in rejecting Carswell's first cause of action without a hearing.

## Second Cause of Action

{¶ 57} Carswell argues in his "Second Cause of Action" that trial counsel was ineffective for failing to research, consult with or use a child interviewing expert. Specifically, he states that "[t]he issue of contamination and outside influences on the child were not explored by defense counsel which affected the reliability of the accusations and failed to give the jury material information for their use in assessing the credibility of L.Y.'s testimony."

{¶ 58} According to Carswell, his expert, clinical psychologist Susan B. Cave, Ph.D., concludes in her affidavit that the protocols testified to by forensic interviewer Wheeler "would likely result in an unreliable response from a child and did in fact result in unreliable statements from L.Y. in this case." This is inaccurate.

{¶ 59} Cave does state in her affidavit that Wheeler made several mistakes during her interview of L.Y. Specifically, Cave alleges that Wheeler "did not properly lay down the rules for conducting the interview," she "developed an inappropriate familiarity with

25.

[L.Y.] and the story" before beginning the recorded interview," she "went into 'safe touch-unsafe touch,' which is not recommended language for the standardized protocols for forensic interviews," she "repeatedly asked sensitive questions more than once," and she "asked leading questions." However, nowhere in the affidavit does Cave state that Wheeler's protocol or alleged mistakes affected, or were likely to affect, the reliability of L.Y.'s account of the events in this case. Even though the ultimate issue in this case involved the credibility and reliability of L.Y.'s statements, because Cave's affidavit fails to demonstrate that Wheeler's actions had or were likely to have had any negative impact on the reliability of L.Y.'s accusations, Carswell's second cause of action is insufficient on its face to raise an issue of whether Carswell was deprived of the effective assistance of counsel based on trial counsel's failure to consult with a child interviewing expert.

**Third and Fourth Causes of Action**

{¶ 60} Carswell argues in his "Third Cause of Action" that trial counsel was ineffective for failing to know, understand or research applicable law concerning volitional acts and Ohio's "Blackout" jury instruction. And in his "Fourth Cause of Action," Carswell claims that trial counsel was ineffective for failing to consult with or call an expert witness to testify as to parasomnia. In support of these claims, Carswell's expert, attorney Zaner, states in his affidavit that trial counsel's failure to "research, contact or consult with a parasomnia expert" was "objectively unreasonable and unduly prejudicial." He explains:

26.

> Since Blackout/sleeping Instructions are now arguably an affirmative defense * * *, it was pertinent to have a parasomnia expert provide evidence to jury [sic] in order for them to understand parasomnia and to utilize in mitigating guilt.

{¶ 61} We note that this court -- based on the record that was before it, which did not include a parasomnia expert -- previously determined in its September 24, 2021 decision that Carswell's offense "is not one that could be committed as a result of a blackout. No reflexes, convulsions, or other involuntary bodily movements by appellant could be involved in the conduct described by the victim." *State v. Carswell*, 6th Dist. Sandusky No. S-20-001, 2021-Ohio-3379, ¶ 43. Had Carswell in the instant matter submitted the affidavit of an expert witness that somehow contradicted this previous conclusion, such may (or may not) have been sufficient to warrant a hearing. He did not. His third and fourth causes of action, which rely solely upon trial counsel's failure to "research," "contact," or "consult" a parasomnia expert, rather than upon an expert's opinion demonstrating the applicability of a parasomnia defense, are insufficient to raise a triable issue of fact as to whether his trial counsel was deficient and whether that deficiency prejudiced him.

### Fifth, Sixth, and Seventh Causes of Action

{¶ 62} Carswell's "Fifth Cause of Action" sets forth a claim that trial counsel was ineffective for failing to "review body camera footage and engage in meaningful cross examination concerning the nearly two (2) hours of Body Camera video that should have been available from the deputies on scene per Department policy, but was not disclosed."

27.

{¶ 63} Affidavit testimony by Carswell family friend Robin Helton provides that Helton helped to see that Carswell's legal bills were paid. According to Helton's review of trial counsel's bills to Carswell, "trial counsel spent NO TIME AT ALL, billed for zero time, reviewing the Body Camera Video of the uniformed Deputies." (Emphasis in original.) On the other hand, Helton concedes that "[c]o-counsel did bill time for reviewing specific body camera video files, * * * a total of SIX body camera videos files – co-counsel billed at total of 3.25 hrs for video review." Helton further attested: "Andrew's Trial counsel never discussed the body camera videos with us at any time leading up to the trial: neither myself, nor [Carswell's wife], nor Andrew had ever seen any of the body camera videos or had any idea that they were in any way significant until after Andrew was convicted."

{¶ 64} Testimony by attorney Zaner suggests that had trial counsel reviewed the BWV footage that was provided in discovery, they would have realized that "there was editing done and there were large amounts of footage missing based on the times listed on the police reports." Zaner opines that "[t]hose [BWV]'s would have provided a fodder of impeachment evidence for trial counsel when compared to their trial testimonies," and that the failure to utilize the BWV's for impeachment purposes "in (basically) a credibility case was objectively unreasonable and unduly prejudicial."

{¶ 65} The "Sixth Cause of Action" contains a claim that counsel was ineffective for failing to prosecute discovery and acquire missing BWV video or obtain an explanation for its lack of preservation. According to Carswell, had trial counsel

28.

conducted this sort of investigation, it would have been possible to: (1) lay a proper foundation to challenge the credibility of the notion that, over the course of 2 hours and nearly thirty minutes, no one in law enforcement even checked on the physical condition of the complainant (L.Y.) or had any interaction with her"; (2) challenge A.R.'s testimony that she did not talk to deputies on the night of the incident; and (3) inform the jury of evidence of "conflicts of interest and bias" resulting from L.Y.'s mother having "personal friendships with some of the police officers, the head of Children's Services and the SANE nurse (Amanda McCall)."

{¶ 66} Regarding the challenge to A.R.'s claim that she did not talk to deputies on the night of the incident, Carswell points to video evidence showing that A.R. was "the source of much of the biographical data the Deputies collected" that night, and that A.R. "talked to Arp and gave her story in the living room." Carswell argues that once A.R. "unequivocally testified that she did not talk to the Deputies, the cross-examination value of any conversation would be extreme – yet no questions were asked." Carswell acknowledges that A.R. was called by Arp several days later, and a recorded statement was elicited.

{¶ 67} Regarding A.Y.'s alleged "personal friendships" with police officers, the head of Children Services and the S.A.N.E. nurse, this court has viewed the relevant BWV footage and read the corresponding transcript. At one point during A.Y.'s conversation with police on the night of the incident, A.Y. mentioned that she had recently bumped into Major Kotsopolous and had given him a hug. (Kostopolous would

29.

later transport L.Y.'s clothing evidence to BCI for testing.) A.Y. further indicated that she probably had S.A.N.E. nurse Angela McCall's number in her phone.

{¶ 68} Carswell argues in his "Seventh Cause of Action" that trial counsel was ineffective for failing to cross examine based upon facts available in the disclosed video. In particular, Carswell claims that Darling should have been cross-examined about claims that he was not present when A.R. "was relaying her story," and that L.Y.'s mother, A.Y., should have been cross-examined about her "name dropping of connections to pertinent officials" and about her failure to take L.Y. to a S.A.N.E. nurse on the night of the incident.

{¶ 69} In reviewing these claims, we note that none of them speak to the core of this case, which involves DNA evidence and the credibility of L.Y. Even if we were to conclude that trial counsel's performance was arguably deficient based upon trial counsel's failure to review and utilize BWV footage for impeachment purposes – which we do not – there is nothing to suggest that without these alleged deficiencies, there was a reasonable probability that the jury would have found Carswell not guilty. Carswell, therefore, failed to provide sufficient operative facts to warrant an evidentiary hearing with respect to the claims alleged in his fifth, sixth, and seventh causes of action.[2]

---

[2] In his initial brief filed with this court, Carswell additionally argues that certain BWV footage showing an open baby gate that makes a clicking noise when opened should have been used to impeach testimony by A.Y. regarding her testimony that the gate usually stays closed and makes a "screeching noise" when opened. This argument was not raised in the trial court and, therefore, will not be considered here, in this appeal. "It is well-settled that a party may not raise for the first time on appeal new issues or legal theories."

30.

**Eighth and Ninth Causes of Action**

{¶ 70} In his "Eighth Cause of Action," Carswell alleges "Prosecutorial Misconduct for lack of candor to the Court, failure to provide exculpatory evidence pursuant to *Brady v. Maryland* and or *Giglio v. United States*, and the knowing misrepresentation of law to the Court." Specifically, Carswell alleges that when the jury sent the note to the court asking if being asleep made Carswell any less guilty, Prosecutor Mulligan falsely indicated to the court that it should repeat its mens rea instruction because "there's no other instruction to give." According to Carswell, Mulligan had to have known that there was an established instruction on blackout/sleep in Ohio, but "misled the Court which then issued a prejudicially deficient jury instruction that led to [Carswell's] convictions." As indicated above, this court previously determined that Carswell's offense is not one that could be committed as a result of a blackout. Thus, there could be no prejudice from Mulligan's alleged failure.

{¶ 71} Carswell additionally states that Prosecutors Braun and Mulligan failed to "turn over some [BWV] videos that contained impeachment evidence against most of [their] witnesses." In particular, Carswell points to "large unexplained gaps as well as editing that was done" on provided videos. Carswell also points to a single page of

---

*State v. Chapman*, 2022-Ohio-2853, 195 N.E.3d 178. ¶ 26 (4th Dist.), citing *Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41, 43, 322 N.E.2d 629 (1975). "Thus, a litigant who fails to raise an argument before the trial court forfeits the right to raise that issue on appeal." *Id.*, citing *Independence v. Office of the Cuyahoga Cty. Executive*, 142 Ohio St.3d 125, 2014-Ohio-4650, 28 N.E.3d 1182, ¶ 30.

31.

incident reports not disclosed in discovery that contains both the exact time of Arp's arrival on scene as well as documentation that the initial call was not to 911, but to the non-emergency line. According to Carswell, this page is material in that: (1) it presents evidence contrary to the testimony of Det. Arp as to his arrival and overall time on scene; (2) it would have generally impeached the notion that the encounter between Arp and the family the night of the incident was brief and immaterial; and (3) it would have impeached the notion that no one saw or talked to either L.Y. or R.Y. on the night of the incident.

{¶ 72} In reviewing these claims, we note that, despite so-called "large unexplained gaps" in the video, there is no evidence that additional video exists. Nor does Carswell cite to any testimony by Arp as to his arrival time and/or overall time on scene. He merely mentions that Arp was on the scene for a period of less than two hours, from 12:41 a.m. until 2:31 a.m.

{¶ 73} As for the previously undisclosed single page of incident reports, we do not perceive any significance in the disclosure that A.Y.'s initial call was to the non-emergency line, rather than to 911. A.Y. herself testified at trial that she could not recall which of the two numbers she dialed. Once again, none of Carswell's allegations speak to the core of this case, which involves DNA evidence and the credibility of L.Y.

{¶ 74} Even if we were to conclude that the state's performance was arguably improper, there is nothing in the record to suggest that without the alleged deficiencies, there was a reasonable probability that the jury would have found Carswell not guilty.

32.

We, therefore, conclude that Carswell failed to provide sufficient operative facts to warrant an evidentiary hearing with respect to the claims alleged in his Eighth cause of action.

{¶ 75} Carswell's "Ninth Cause of Action" alleges "Prosecutorial Misconduct for eliciting testimony when it knew or should have known that the testimony of several key witnesses was false or not candid." Carswell asserts that the state elicited "extensive false testimony" regarding the gate that led to the basement, specifically that it made a "loud noise" when opened and that it "could not" be left open. Carswell further claims that the state elicited "extensive false testimony" from A.R. that she "did not talk" to either of the deputies or to Arp on the night of the incident. Finally, Carswell claims that false testimony was elicited from Angela Wheeler, the investigator who interviewed L.Y., when she testified that "it is part of her process to meet children prior to interviewing them, but that she does not go into the allegations at all." Because none of these facts, even if true, were central to the case against Carswell, we do not find them sufficient to warrant an evidentiary hearing in connection with his claim that he was prejudiced as a result of prosecutorial misconduct.

### Tenth Cause of Action

{¶ 76} The "Tenth Cause of Action" asserts that "[i]ndividually and collectively, the errors committed by the Prosecutor and Petitioner's Trial Counsel prejudiced the Appellant's right to a fair trial." As we have found merit with respect to only one of Carwell's causes of action and that the proper remedy in that instance is not reversal, but

33.

rather a hearing on the matter, we dismiss Carswell's tenth cause of action without further analysis.

## Conclusion

{¶ 77} As there remains a genuine issue of material fact as to the first cause of action set forth in Carswell's postconviction petition, he is not entitled to summary judgment in this matter. Accordingly, Carswell's first assignment of error is not well-taken. Because the trial court erred in dismissing Carswell's first cause of action, Carswell's second assignment of error is found well-taken. The judgment of the Sandusky County Court of Common Pleas is affirmed in part and reversed in part, consistent with this opinion. This case is remanded to the trial court for a hearing only on Carswell's first cause of action, involving a claim of ineffective assistance of counsel based on trial counsel's failure to investigate and challenge DNA evidence through expert testimony. Appellant and appellee are ordered to divide the costs of appeal pursuant to App.R. 24.

Judgment affirmed, in part,
reversed, in part, and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

34.

State of Ohio
v. Andrew Carswell
C.A. No. S-22-018



Christine E. Mayle, J.          _____
                                                JUDGE

Gene A. Zmuda, J.          

                                _____
Charles E. Sulek, J.          JUDGE
CONCUR.

                                _____
                                                JUDGE



This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.